# UNITED STATES DISTRICT COURT
## IN THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

AJUBA INTERNATIONAL, LLC, a Michigan
limited liability company, AJUBA
SOLUTIONS (INDIA) PRIVATE, LTD., an
Indian corporation, and MIRAMED GLOBAL
SERVICES, INC., a Michigan corporation,

           Plaintiffs,

v.

DEVENDRA KUMAR SAHARIA, an
individual, ADROIT GLOBAL SOLUTIONS
INDIA PRIVATE LTD., an Indian
corporation, ADROIT GLOBAL
SOLUTIONS, INC., a Delaware corporation,
and AGS HEALTH, INC., a Delaware
corporation,

           Defendants.

Case No. 11-cv-12936

Hon. Marianne O. Battani

---

DYKEMA GOSSETT PLLC
Patrick F. Hickey (P36648)
Andrew J. Kolozsvary (P68885)
Attorneys for Plaintiffs
400 Renaissance Center, 37th Floor
Detroit, MI 47243
313.568.6800

---

## FIRST AMENDED COMPLAINT AND JURY DEMAND

Plaintiffs Ajuba International, LLC ("Ajuba International"), Ajuba Solutions (India)

Private, Ltd. ("Ajuba Solutions") (Ajuba Solutions and Ajuba International are collectively

referred to as "Ajuba"), and MiraMed Global Services, Inc. ("MiraMed") (collectively,

"Plaintiffs"), for their first amended complaint against Defendants Devendra Kumar Saharia,

Adroit Global Solutions India Private Ltd. ("AGS India"), Adroit Global Solutions, Inc. ("AGS

U.S."), and AGS Health, Inc. ("AGS Health") (AGS India, AGS U.S., and AGS Health are

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•400 RENAISSANCE CENTER•DETROIT, MICHIGAN 48243

collectively referred to as "AGS," and all defendants are collectively referred to as

"Defendants"), state as follows:

## PARTIES AND JURISDICTION

1.      Ajuba International is a Michigan limited liability company with its principal

place of business in Jackson, Michigan.

2.      Ajuba Solutions is an Indian corporation with its principal place of business in

Chennai, India.

3.      MiraMed is a Michigan corporation with its principal place of business in

Jackson, Michigan.

4.      Ajuba Solutions is an indirect wholly owned subsidiary of Ajuba International,

which in turn is a wholly owned subsidiary of MiraMed.

5.      On information and belief, Devendra Kumar Saharia currently resides in Chennai,

India, but previously resided in Michigan, owns property and maintains assets elsewhere in the

United States, was in continuous and systematic contact with Plaintiffs in Michigan as alleged in

more detail below, continues to have contact with and travel to the United States to further carry

out the tortious conduct as alleged in more detail below, and has caused and is causing injury to

Ajuba International in Michigan as alleged in more detail below.

6.      AGS India is an Indian corporation with its principal place of business in

Chennai, India.  Saharia is the Chief Executive Officer of AGS India.

7.      AGS U.S. is a Delaware corporation with, on information and belief, its principal

place of business in Pennsylvania.  AGS U.S. is believed to be an operating affiliate of AGS

India, and Saharia is believed to be an officer of AGS U.S.

2

8. AGS Health is a Delaware corporation with, on information and belief, its principal place of business in New York. AGS Health is believed to be an operating affiliate of AGS India, and Saharia is believed to be an officer of AGS Health.

9. Pursuant to 28 U.S.C. § 1331, this Court has subject matter jurisdiction over this action because it arises under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030. This Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367 because they are so related to the federal claim that they form part of the same case or controversy.

10. Pursuant to 28 U.S.C. § 1332(a)(3), this Court has subject matter jurisdiction over this action because the amount in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different States and in which citizens or subjects of a foreign state are additional parties.

11. This Court has personal jurisdiction over Saharia because Saharia consented to jurisdiction in Michigan; and because this action arises out of Saharia's transaction of business within Michigan, Saharia's doing or causing an act to be done, or consequence to occur, in Michigan resulting in an action for tort, and/or Saharia's actions as an officer of Ajuba.

12. This Court has personal jurisdiction over AGS because this action arises out of AGS's transaction of business in Michigan and/or AGS's doing or causing an act to be done, or consequence to occur, in Michigan resulting in an action for tort.

13. Venue is proper in this Court because Plaintiffs are resident in this district, all or part of the causes of action occurred and/or arose in this district, and one or more of the Defendants have transacted business within this district.

3

## GENERAL ALLEGATIONS

### A.   Background

14.     Ajuba is a premier provider of revenue cycle outsourcing services to healthcare systems, hospitals, academic and medical centers, and billing and receivables management companies, and has established itself as one of the leading revenue cycle outsourcing companies in India and the United States.

15.     Ajuba's primary customers are hospitals, health care organizations, and health care outsourcing companies located throughout the United States.

16.     Ajuba is composed of two separate but related entities: Ajuba International, based in Michigan, and Ajuba Solutions, based in India.

17.     Ajuba contracts with its clients through Ajuba International, the Michigan entity.

18.     Ajuba International also has contracts with affiliated entities, including Plaintiff MiraMed, for the provision of services to those affiliates.

19.     Ajuba's sales and client relations activities are performed both by Ajuba International in Michigan and Ajuba Solutions in India.

20.     Ajuba's core data coding and processing and call center functions are conducted by Ajuba Solutions in India and transmitted or communicated to customers throughout the United States.

21.     Ajuba International and Ajuba Solutions collectively have approximately 1800 employees worldwide, and in 2010, the Great Places To Work® Institute placed Ajuba Solutions in the top 10 on its list of "India's Best Companies To Work For."

4

**B.**     **Saharia Enters Into A July 2005 Noncompetition Agreement With Ajuba International And A July 2005 Employment Agreement With Ajuba International And Ajuba Solutions.**

22.     Saharia was an original founding shareholder of Ajuba International's predecessor[1] when the company was formed in 2000, and, from the outset, was in charge of setting up Ajuba's operations in India, including establishing Ajuba's Indian accounts and information technology infrastructure and recruiting and hiring employees.

23.     Saharia continuously acted as an agent and officer of Ajuba International and Ajuba Solutions from Ajuba's founding in 2000 through his resignation, which was effective March 31, 2011.

24.     Saharia sold his ownership interest in Ajuba International to MiraMed in July 2005 for substantial consideration, including the payment of approximately $2.55 Million, but continued to act as an agent and officer of both Ajuba International and Ajuba Solutions.

25.     On July 8, 2005, as consideration for and part of the July 2005 transaction in which he sold his ownership interest in Ajuba International, Saharia entered into a Noncompetition Agreement with Ajuba International.  A copy of the Noncompetition Agreement is attached as Exhibit A.

26.     As expressly stated in the Noncompetition Agreement, MiraMed was unwilling to purchase Saharia's stock in Ajuba International unless Saharia executed and delivered the Noncompetition Agreement.

27.     The Noncompetition Agreement prohibited Saharia from competing with Ajuba International, inducing Ajuba International's customers to patronize a business in competition

---

[1] Ajuba International, Inc., a Delaware corporation, merged with Ajuba International, LLC in 2007, with Ajuba International, LLC the surviving entity.

5

with it, and soliciting Ajuba International's employees for a "Restricted Period" of three years from the date of the agreement.

28. The Restricted Period under the Noncompetition Agreement expired on July 8, 2008.

29. The Noncompetition Agreement also contains a confidentiality provision, which continues beyond the Restricted Period and pursuant to which Saharia agreed as follows:

> The Shareholder [i.e., Saharia] shall not disclose or use at any time, either during or *subsequent to the Restricted Period*, any Confidential Information of which the Shareholder currently has knowledge or of which he becomes aware during or after the Restricted Period, whether or not developed by the Shareholder. "Confidential Information" shall include information concerning the Company [i.e., Ajuba International "and its subsidiaries and any corporation or entity that now, or at any time after the date of this Agreement, is a successor (whether by purchase or all or substantially all of the business and/or assets, merger, consolidation or liquidation), subsidiary or affiliate of the Company"], the Company's clients, the Buyer [i.e., MiraMed] and the Buyer's clients, not generally known in the business community, including, but not limited to, information concerning client names, price lists, sales and service records, equipment, methods, improvements, data, sales figures, projections, quotations, estimates, accounting and billing procedures, other records, trade secrets, reports, budgets and other financial information, the acquisition, installation and utilization of equipment and procedures, technological developments, "know how", computer programs, developments, data, discoveries, ideas, concepts, computer programs, algorithms, protocols, systems and related documentation, and any other works of invention or authorship (whether or not patentable, copyrightable, or entitled to or eligible for other forms of legal protection), and the like….

(Ex. A, § 3.A (emphasis added).)

30. The confidentiality provision in the Noncompetition Agreement survives the termination of the Agreement. (*Id.*, § 3.B.)

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•400 RENAISSANCE CENTER•DETROIT, MICHIGAN 48243

31.     The Noncompetition Agreement also prohibits Saharia from "disparag[ing], criticiz[ing] or mak[ing] statements to the detriment of" Ajuba International "[w]hile this Agreement is in effect and indefinitely thereafter." (*Id.*, § 4.)

32.     The Noncompetition Agreement further provides that it "shall be construed under the laws of the State of Michigan" and that "[a]ny action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may be brought against any of the parties in the courts of the State of Michigan, County of Jackson, or, if it has or can acquire jurisdiction, in the United States District Court for the Eastern District of Michigan, and each of the parties consents to the jurisdiction of such courts (and of the appropriate appellate courts (in any such action or proceeding and waives any objection to venue laid therein." (*Id.* § 5.E.)

33.     Also on July 8, 2005, as additional consideration for and part of the July 2005 transaction, Saharia entered into an Employment Agreement ("2005 Employment Agreement") with Ajuba International and Ajuba Solutions, pursuant to which Saharia was employed as President of Ajuba Solutions and appointed President-International for Ajuba International.  A copy of the 2005 Employment Agreement is attached as Exhibit B.

34.     In the 2005 Employment Agreement, Saharia acknowledged the competitive nature of Ajuba's business and agreed not to compete with Ajuba or solicit Ajuba's customers or employees for a restricted period of three years after the termination of his employment with Ajuba.

35.     The 2005 Employment Agreement also contained confidentiality and non-disparagement provisions. (Ex. B, §§ 3.1, 4.2, 9.13.)

7

2:11-cv-12936-MOB-LJM   Doc # 11   Filed 10/17/11   Pg 8 of 27   Pg ID 137

**C.**   **Saharia Signs 2008 Employment Agreement With Ajuba Solutions And Continues To Act As Agent And Officer Of Ajuba International.**

36.   Saharia's employment as President of Ajuba Solutions continued uninterrupted after the expiration of the 2005 Employment Agreement, and on November 10, 2008, Saharia entered into another Employment Agreement ("2008 Employment Agreement") with Ajuba Solutions reflecting Saharia's continued employment as President of Ajuba Solutions.  A copy of the 2008 Employment Agreement is attached as Exhibit C.

37.   Pursuant to the November 2008 Employment Agreement, Saharia agreed to perform the duties "customarily performed by a President…and such other legally permissible and proper duties as may be assigned from time to time by Tony Mira, Chairman of MiraMed…." (Ex. C, § 2.1.)

38.   Saharia also agreed "to comply with all of the Company's policies, standards and regulations as promulgated by the officers of the Company and to follow the instructions and directives of the Board." (*Id.*)

39.   Saharia further agreed that he would "devote his full professional and business-related time, skills and best efforts to such duties on behalf of the Company and will not, during the Employment Term be engaged (whether or not during normal business hours) in any other business or professional activity." (*Id.*)

40.   Saharia also agreed "not to disparage [Ajuba Solutions], [its] respective affiliates or [its] respective officers, directors or employees." (*Id.*, § 7.12.)

41.   The 2008 Employment Agreement provided restrictions protecting Ajuba Solutions' highly sensitive, proprietary, and economically valuable confidential information and technology. (*Id.*, § 3.1 & 4.2.)

8

42.     With respect to confidential information, the 2008 Employment Agreement specifically protected information concerning Ajuba Solutions and its "Business," defined as "the activities engaged in by the Company and products and services of the Company provided at any time during the Employment Term to hospitals, physicians and such other entities serviced by the Company at any time during the Employment Term in the United States and India…." (*Id.*, § 1.1.)

43.     In the 2008 Employment Agreement, Saharia agreed not to "directly or indirectly…use, publish, divulge, reproduce, transmit, or provide Confidential Information or any portion thereof…."  (*Id.*, § 3.1.)

44.     Saharia further agreed that he would return the Confidential Information and permanently delete or destroy all electronically stored copies upon the termination of his employment.  (*Id.*, § 3.2.)

45.     Saharia continued to act as an agent and officer of Ajuba International after November 2008.

46.     When co-founder Nader Samii left Ajuba International in January 2009, Saharia took over all of Samii's duties, roles, and responsibilities on behalf of Ajuba International in the United States.

47.     Saharia's duties, roles, and responsibilities on behalf of Ajuba International included being the lead point of contact with Ajuba International's customers regarding contract negotiation, contract performance, client services, personnel, and pricing issues; managing Ajuba International's employees and processes in the United States; and assisting in the closure of Ajuba International's North Carolina office and transition of it to its current Michigan location.

2:11-cv-12936-MOB-LJM   Doc # 11   Filed 10/17/11   Pg 10 of 27   Pg ID 139

48.     In his role with Ajuba International, Saharia was the primary contact for Ajuba International's customers and employees in the United States regarding all aspects of Ajuba International's business here, and was responsible for managing Ajuba International's client and employee relations in the United States.

49.     By way of example only, in March 2009, Saharia negotiated issues related to the termination of a key Ajuba International employee based in the United States, and signed (on behalf of Ajuba International) a severance agreement between the employee and Ajuba International.

50.     By way of further example, in January 2010, Saharia negotiated and signed an extension of a contract for services with a client on behalf of Ajuba International, signing the contract as "President" of Ajuba International.

51.     Saharia also signed a business associates agreement with another Ajuba International client in January 2010, again on behalf of Ajuba International.

52.     Likewise, by way of still further example, in April 2010, Saharia negotiated an agreement for services with a client on behalf of Ajuba International, again signing the contract as "President" of Ajuba International.

53.     In September 2010, Saharia signed an amendment to the April 2010 agreement on behalf of Ajuba International.

54.     Saharia assisted in the transition of Ajuba International's headquarters from North Carolina to its current location in Michigan.

55.     During his tenure with Ajuba, Saharia was entrusted with responsibility for the management and efficient operation of the company's business activities in India and, following Samii's departure in January 2009, in the United States, including but not limited to building

10

relationships with and attending to existing customers, approaching new customers, negotiating contracts and renewal contracts with current and prospective customers, and entering into contracts and contract renewals with customers on behalf of Ajuba.

56.     Saharia also was responsible for managing all of Ajuba's finance, accounting, cash management, and human resources functions in India, including hiring and compensation decisions.  Saharia similarly managed those functions in the United States after Samii's departure.

57.     Saharia was responsible for providing recommendations to Mr. Mira regarding Ajuba's corporate and financial strategy, including: expansion of services, expansion of business lines, contractual negotiations, mergers and acquisitions, corporate finance, and strategic partnership arrangements.

58.     Saharia participated, in person, in numerous meetings with investment bankers and potential investors regarding MiraMed and Ajuba in 2009 through 2011, including meetings in Michigan and New York.

59.     Saharia was required to report directly to Tony Mira, President of Ajuba International and Chairman of the Board of MiraMed.

60.     Ajuba International, MiraMed, and Mr. Mira are all located in Michigan.

61.     Thus, Saharia was in continuous contact with Mr. Mira in Michigan, in person and by telephone and email, as a necessary part of carrying out his duties on behalf of Ajuba International and Ajuba Solutions.

62.     All of Saharia's innumerable relevant communications with Plaintiffs occurred in or were directed to Michigan.

11

**D.**   **Saharia's Access To Ajuba's Trade Secrets And Other Confidential Information.**

63.   As an agent and officer of Ajuba, Saharia acquired and had access to all information relating to the company, its business, and its customers, including its trade secrets and other sensitive, confidential, proprietary, and economically valuable information regarding Ajuba's products, services, methods, know-how, research, development, processes; operating and other cost data of the business; lists of present, past, and prospective clients; sensitive, confidential credit and financial data concerning such clients; client proposals; price lists and data relating to pricing of Ajuba's products or services; sales activities, procedures, and techniques; employees performance and compensation; and computer programs and data bases.

64.   Such confidential information further included sensitive and confidential information relating to Ajuba's customer's business and business models, all customer communications, and information regarding Ajuba's customer's key contact persons, decision-makers, pricing, costs, templates, proposals, likes, dislikes, complaints, and other information developed over time in order to acquire and maintain business and contractual relationships with these customers and better serve their needs.

65.   Ajuba collected, analyzed, and compiled this confidential information over the course of years of research, performance, and interaction with customers and their representatives by thousands of Ajuba employees, and has enormous value to the company by virtue of it remaining secret.

66.   This confidential information was to be primarily maintained electronically on the company's secure servers, with back up copies made to hard drives at regular intervals.

67.   Additionally, all information regarding Ajuba's past and present employees, including their personal information, compensation, employment agreements, and other

12

employment-related records were maintained in Ajuba's offices in India under Saharia's custody or control.

68.     Plaintiffs reposed complete trust and faith in Saharia when it granted Saharia access to and use of Ajuba's trade secrets and confidential information, and believed he would, as he contractually agreed, us such information only in the best interest of Ajuba and its shareholders.

**E.   Saharia's Secret Plan To Form AGS and Misappropriate Ajuba's Trade Secrets To Unfairly Compete With Ajuba.**

69.     On February 24, 2011, Saharia submitted his resignation to Ajuba effective March 31, 2011.

70.     In discussions with Tony Mira regarding his resignation, Saharia affirmatively represented that he was leaving Ajuba for personal reasons, was getting out of the business in which Ajuba was engaged, and had no intention of competing with Ajuba.

71.     Unbeknownst to Plaintiffs and contrary to Saharia's representations, Saharia had already established or participated in the establishment of AGS India for the sole purpose of directly competing with Ajuba—and had taken affirmative steps to do so while still acting as an agent and officer of Ajuba International and President of Ajuba Solutions.

72.     On information and belief, while still an officer of Ajuba, Saharia formed or directed others to form the entity AGS India, obtain investors, and acquire office space in the very same office building occupied by Ajuba in India.

73.     On information and belief, shortly after his departure from Ajuba, Saharia also formed or caused to be formed AGS U.S. and AGS Health, and is an officer of those entities.

13

74.     While still an officer of Ajuba, Saharia also covertly orchestrated the mass departures of key management personnel at Ajuba, conspiring with those then-current Ajuba employees to leave Ajuba and join AGS.

75.     Among others, Ajuba's former Director of Operations, Maya Mohan; Ajuba's former Director of Finance and Human Resources, Shankar Narasimhan; Ajuba's former Director of Client Services, Stephanie Gregory; Executive Vice President for Technology, T. Jagannathan; Ajuba's former manager of coding and health care services, Paul Praveen; Ajuba's former manager, Elango Madhavan; Ajuba's former manager of corporate communications, Shiva Ganesh; and Ajuba's former senior manager for competency development, Dominic Rajesh, were all persuaded by Saharia to leave Ajuba and join AGS.

76.     Prior to Saharia's implementation of his plan, he abused his authority on behalf of Ajuba by revising the employment contracts of key Ajuba employees so as to remove restrictive covenants, while concealing these decisions from Mr. Mira.

77.     Saharia allowed key employees to resign while representing to Mr. Mira that Ajuba should not attempt to retain them and that it was good that they were leaving the company, only to immediately hire them at AGS.

78.     Indeed, Mr. Mira asked Saharia several times if he could speak with the key employees, including the Director of Operations, to try to change their minds about leaving Ajuba or persuade them to stay, but Saharia refused, telling Mr. Mira that he should not interfere given that Saharia was in charge, was the most knowledgeable person on the ground in India, and it would send the wrong message to other Ajuba employees.

79.     Saharia also allowed other employees to change their employment status from employee to consultant to facilitate their transition to AGS.

14

80.     Saharia abused his fiduciary position of trust and confidence with Ajuba in additional ways, all in order to advance his own interests and the interests of AGS at the expense of Ajuba.

81.     For example, Saharia purposely allowed contracts with key Ajuba customers to expire without disclosing these decisions to Mr. Mira or Ajuba's board, despite weekly meetings with Mr. Mira during which all material business decisions were to be discussed.

82.     At the time he announced his resignation, Saharia further represented to Mr. Mira that he had only personal information on his Ajuba-issued laptop, and wished to retain it after his departure. Based on this representation, the representation that Saharia was getting out of the business, and Mr. Mira's utmost trust in Saharia, Mr. Mira agreed to allow Saharia to retain the laptop.

83.     Contrary to his representations, Saharia improperly misappropriated Ajuba's trade secrets and other confidential information, including electronically stored information on his Ajuba-issued laptop, and has provided this information to AGS.

84.     Saharia and AGS also conspired to have the other former Ajuba employees who joined AGS make copies of electronically stored Ajuba trade secrets and confidential information before departing and then delete the files from Ajuba's computer systems.

85.     When Ajuba's new Director of Finance and Human Resources joined the company after Saharia's departure, it was discovered that most of the data related to day to day work, award feedback forms, contacts, and the like could not be found.

86.     Upon further investigation, Ajuba learned that the above-described electronically stored confidential information, which were meant to be securely stored on the company's server, had been removed by Saharia in the laptop taken away by him.

87.     None of this confidential information for the period 2005 to 2010 is presently

available in the Ajuba servers or in the office of the company in any other form.

88.     Ajuba has since discovered that the majority of the hard drives containing back up

data had been erased or deleted, leaving no trace of any information previously stored thereon.

89.     Attempts to steal, gain unauthorized access to, and alter or interfere with Ajuba's

computer files and electronically stored information continue, including the following incidents,

all of which are under further investigation:

    (a)    An Ajuba employee—who has now joined AGS—was observed copying Ajuba computer files to a CD and taking the CD out of Ajuba's office building.

    (b)    On or about Friday, July 1, 2011, AGS gained unauthorized access to and disrupted several of Ajuba's websites.

    (c)    On Tuesday, July 5, 2011, Ajuba received notice from a client that an FTP account for the transmission of sensitive information between the client and Ajuba was compromised.

**F.     Saharia's Campaign Of Unfair, Unethical "Competiton."**

90.     Armed with Ajuba's misappropriated trade secrets and other confidential

information, Saharia and AGS have embarked on a campaign to steal away Ajuba's customers

and employees.

91.     Saharia and AGS have approached and aggressively solicited several of Ajuba's

largest and most important customers, using Ajuba's confidential information regarding needs,

pricing, history, proposals, credit and financial data; and other client-specific information in an

effort to entice them to join AGS.

92.     Saharia and others on behalf of AGS have traveled to the United States to meet in

person with Ajuba's customers as part of their campaign of interference and disruption.

16

93.     Based upon false and disparaging statements made by Saharia  and those working with him, Saharia has succeeded in persuading Ajuba customers to partially terminate their contractual relations with Ajuba International and move that business to AGS.

94.     Simultaneously, Saharia and others on behalf of AGS are attempting to poach the teams of Ajuba employees assigned to work for the Ajuba customers AGS has targeted.

95.     In the course of their efforts to steal Ajuba employees, Saharia and AGS have made false and disparaging statements about Ajuba and its viability as a place of employment.

96.     Saharia or others on behalf of AGS also have contacted the Great Places to Work Institute, requesting that Ajuba no longer be listed as one of "India's Best Companies To Work For" because Ajuba upper management—i.e., Saharia and the other former Ajuba employees with whom Saharia conspired—left Ajuba to join AGS.

97.     Saharia and AGS have already succeeded in disrupting Ajuba's contractual relationship with one of Ajuba's most important customers, as the customer has abruptly terminated Ajuba International's contract with it as a service provider on certain projects, transferring that work to AGS.

98.     Saharia and AGS continue this campaign of improper, unethical conduct to this day.

## COUNT I
## BREACH OF FIDUCIARY DUTIES AGAINST SAHARIA

99.     Plaintiffs incorporate by reference all prior paragraphs as though fully set forth herein.

100.     As an agent and/or officer of Ajuba International, Saharia owed fiduciary duties to his principal, Ajuba International.

101.    As an agent and/or officer of Ajuba Solutions, Saharia also owed fiduciary duties to his principal, Ajuba Solutions.

102.    The fiduciary duties Saharia owed to Ajuba included the duties of care, good faith, and loyalty; the duty to act in Ajuba's best interests and not for his own individual benefit; and the duty to communicate to his principal facts relating to the business which ought in good faith be made known to the latter.

103.    Saharia violated his fiduciary duties to Plaintiffs as set forth above.

104.    As a direct and proximate result of these breaches of fiduciary duties set forth above, Plaintiffs have suffered and continue to suffer damages.

WHEREFORE, Plaintiffs pray that this Court enter judgment in favor of them and against Saharia for damages, plus interest, costs and attorney fees, and for such other and additional relief as the court may deem appropriate.

## COUNT II
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES
### AGAINST AGS

105.    Plaintiffs incorporate by reference all prior paragraphs as though fully set forth herein.

106.    Saharia breached his fiduciary duties to Ajuba International and Ajuba Solutions as described above.

107.    AGS knowingly participated in Saharia's violations of fiduciary duties as described above.

108.    AGS is jointly and severally liable with Saharia for the damages caused by the violations of Saharia's fiduciary duties.

WHEREFORE, Plaintiffs pray that this Court enter judgment in their favor and against Defendants for damages, plus interest, costs and attorney fees, and for such other and additional relief as the court may deem appropriate.

## COUNT III
## BREACH OF OF NONCOMPETITION AGREEMENT AGAINST SAHARIA

109.    Plaintiffs incorporate by reference all prior paragraphs as though fully set forth herein.

110.    The Noncompetition Agreement is a binding contract between Saharia and Ajuba International.

111.    Saharia breached the confidentiality and non-disparagement provisions of the Noncompetition Agreement.

112.    These provisions extend beyond the "Restricted Period" in the Agreement and survive the Agreement's termination.

113.    As a result of Saharia's breach of contract, Ajuba Internatioanl has suffered and will continue to suffer substantial damages.

WHEREFORE, Plaintiffs pray that this Court enter judgment in favor of them and against Saharia for damages, plus interest, costs and attorney fees, and for such other and additional relief as the court may deem appropriate.

## COUNT IV
## BREACH OF 2008 EMPLOYMENT AGREEMENT AGAINST SAHARIA

114.    Plaintiffs incorporate by reference all prior paragraphs as though fully set forth herein.

115.    The 2008 Employment Agreement is a binding contract between Saharia and Ajuba Solutions.

19

116.    Saharia breached the contract in material ways as discussed above, including breach of Saharia's duties as President, breach of Saharia's obligations under the confidentiality provisions, and breach of the non-disparagement provisions.

117.    As a result of Saharia's breach of contract, Ajuba Solutions has suffered and will continue to suffer substantial damages.

WHEREFORE, Plaintiffs pray that this Court enter judgment in favor of them and against Saharia for damages, plus interest, costs and attorney fees, and for such other and additional relief as the court may deem appropriate.

## COUNT V
## TORTIOUS INTERFERENCE AGAINST ALL DEFENDANTS

118.    Plaintiffs incorporate by reference all prior paragraphs as though fully set forth herein.

119.    Plaintiffs have contractual and business relationships and expectancies with current and prospective customers and employees.

120.    Defendants were aware of these relationships and expectancies.

121.    Defendants intentionally and improperly interfered with these relationships and expectancies in the ways described above, including by misappropriating Ajuba's trade secrets and other confidential information as part of their effort to aggressively solicit and entice away Ajuba's customers; engaging and/or directing others to engage in unauthorized access of Ajuba's computers and electronically stored information to steal Ajuba's trade secrets and other confidential information; and disparaging Ajuba in an effort to solicit and entice away its employees.

20

122.     The actions of Defendants were fraudulent, unlawful, unethical, unjustified, and per se wrongful, and were done with malice for the improper purpose of causing the termination or disruption of Plaintiffs' relationships and expectancies.

123.     The conduct of Defendants have caused and threaten to cause breaches and disruptions of Plaintiffs' relationships and expectancies, including but not limited to the disruption and/or termination of Ajuba International's contracts with its clients.

124.     Plaintiffs have suffered and will continue to suffer damages as a result of Defendants' conduct.

WHEREFORE, Plaintiffs pray that this Court enter judgment in their favor and against Defendants for injunctive relief; damages, plus interest, costs and attorney fees; and for such other and additional relief as the court may deem appropriate.

## COUNT IV
## MISAPPROPRIATION OF TRADE SECRETS AGAINST ALL DEFENDANTS

125.     Plaintiffs incorporate by reference all prior paragraphs as though fully set forth herein.

126.     Ajuba owns trade secrets, including lists of present, past and prospective clients, and credit and financial data concerning such clients, client proposals, price lists and data relating to pricing of Ajuba's products or services, and sales activities, procedures, and techniques.

127.     This information derives economic value from not being generally known to or ascertainably by other persons who can obtain economic value from its disclosure or use.

128.     Ajuba took reasonable means to maintain the secrecy of this information, including requiring all employees to sign confidentiality agreements.

129.     Saharia and AGS have misappropriated Ajuba's trade secrets.

130.    Saharia has disclosed Ajuba's trade secrets to AGS and has used those trade secrets in his attempt to usurp Ajuba opportunities and steal Ajuba customers, and he knew when he acquired the trade secret information that he owed a duty to Ajuba to maintain its secrecy or limit its use.

131.    Moreover, when Saharia departed Ajuba, he improperly took and retained Ajuba trade secret information contained on his Ajuba-issued laptop while misrepresenting that the laptop contained only personal information

132.    AGS acquired Ajuba's trade secret information from Saharia and others acting at his direction, and knew or should have known that Saharia owed a duty to Ajuba to maintain the secrecy or limit the use of the information.

133.    Ajuba has suffered and will continue to suffer damages and irreparable harm as a result of Defendants' misappropriation.

WHEREFORE, Plaintiffs pray that this Court enter judgment in their favor and against Defendants for injunctive relief; damages, plus interest, costs and attorney fees; and for such other and additional relief as the court may deem appropriate.

### COUNT VII
### VIOLATION OF COMPUTER FRAUD AND ABUSE ACT AGAINST ALL DEFENDANTS

134.    Plaintiffs incorporate by reference all prior paragraphs as though fully set forth herein.

135.    Ajuba's computers are used in interstate or foreign commerce or communication in a manner that affects interstate or foreign commerce or communication of the United States.

136.    Thus, Ajuba's computers are protected computers under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030.

22

137.    Defendants intentionally accessed a computer without authorization or in excess of authorization, and thereby obtained information from Ajuba's protected computers.

138.    Defendants also knowingly and with intent to defraud accessed Ajuba's protected computers without authorization or in excess of authorized access, and by means of such conduct furthered the intended fraud and obtained Ajuba's highly valuable trade secrets and other confidential information.

139.    Specifically, as described above, Defendants either had no authorization to use or access Ajuba's computers, lost their authorization when they violated their duties of loyalty and contractual obligations, or accessed Ajuba's computers with authorization but then used such access to obtain or alter information in the computer in ways they were not entitled, including copying, deleting, and removing the files from Ajuba's premises.

140.    Defendants also exceeded authorization by using or disclosing information obtained from their access of Ajuba's computers in ways that violate Ajuba's use and disclosure restrictions.

141.    Defendants accessed Ajuba's computers with knowledge and intent to copy, delete, remove, use, disclose, and misappropriate Ajuba's trade secrets and other confidential information in furtherance of their scheme to unlawfully steal Ajuba's customers and employees.

142.    Plaintiffs have suffered damages and loss by reason of Defendants' violations of the CFAA, and such damages and losses exceed $5,000 in any one year period.

WHEREFORE, Plaintiffs pray that this Court enter judgment in their favor and against Defendants for injunctive relief; damages, plus interest, costs and attorney fees; and for such other and additional relief as the court may deem appropriate.

## COUNT VIII
## FRAUD

143.     Plaintiffs incorporate by reference all prior paragraphs as though fully set forth herein.

144.     Defendant Saharia made misrepresentations of material fact as alleged above.

145.     These representations were false.

146.     Defendant Saharia knew the representations were false, or made the representations recklessly without knowledge of their truth or falsity.

147.     Defendant Saharia made the representations with the intent that Plaintiffs rely on them.

148.     Plaintiffs relied on the representations to their detriment as alleged above.

149.     Plaintiffs have suffered damages as a result.

WHEREFORE, Plaintiffs pray that this Court enter judgment in favor of them and against Saharia for damages, plus interest, costs and attorney fees, and for such other and additional relief as the court may deem appropriate.

## COUNT IX
## SILENT FRAUD

150.     Plaintiffs incorporate by reference all prior paragraphs as though fully set forth herein.

151.     Defendant Saharia suppressed material facts that he was duty-bound to disclose to Plaintiffs as alleged above.

152.     Defendant Saharia had actual knowledge of the facts.

153.     Defendant Saharia's failure to disclose caused Plaintiffs to have a false impression.

24

154.    When Defendant Saharia failed to disclose the facts, Defendant knew the failure would create a false impression in Plaintiffs.

155.    When Defendant Saharia failed to disclose the facts, Defendant intended that Plaintiffs rely on the false impressions.

156.    Plaintiffs relied on the false impressions and suffered damages as a result.

WHEREFORE, Plaintiffs pray that this Court enter judgment in favor of them and against Saharia for damages, plus interest, costs and attorney fees, and for such other and additional relief as the court may deem appropriate.

## COUNT X
## UNJUST ENRICHMENT AGAINST ALL DEFENDANTS

157.    Plaintiffs incorporate by reference all prior paragraphs as though fully set forth herein.

158.    Defendants have received benefits as stated above that are unjust, unfair, and inequitable, and should be returned by them.

159.    These benefits have come at the expense of Plaintiffs, and it would be inequitable for Defendants to retain the benefits.

160.    Defendants have been unjustly enriched at Plaintiffs' expense.

WHEREFORE, Plaintiffs pray that this Court enter judgment in favor of them and against Defendants for damages, plus interest, costs and attorney fees, and for such other and additional relief as the court may deem appropriate.

## COUNT XI
## CIVIL CONSPIRACY/CONCERT OF ACTION AGAINST ALL DEFENDANTS

161.    Plaintiffs incorporate by reference all prior paragraphs as though fully set forth herein.

2:11-cv-12936-MOB-LJM   Doc # 11   Filed 10/17/11   Pg 26 of 27   Pg ID 155

162.    Defendants each acted in concert and/or by agreement or pre-conceived plan to use lawful or unlawful means to accomplish an illegal or wrongful objectives described above.

163.    Through their concerted action, Defendants misappropriated Ajuba confidential information; engaged in unauthorized access and/or use of Ajuba's computer systems and confidential electronically stored information; breached contractual, fiduciary, and common law duties; tortiously interfered with Plaintiffs' contractual and business relationships and expectancies; and engaged in other wrongful acts that harmed Plaintiffs.

164.    As a direct and proximate result, Plaintiffs have suffered damages.

WHEREFORE, Plaintiffs pray that this Court enter judgment in favor of them and against Defendants for damages, plus interest, costs and attorney fees, and for such other and additional relief as the court may deem appropriate.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

DYKEMA GOSSETT PLLC


By: :/s/ Andrew J. Kolozsvary
    Patrick F. Hickey (P36648)
    Andrew J. Kolozsvary (P68885)
    Attorneys for Plaintiffs
    400 Renaissance Center
    Detroit, MI 48243
    313-568-6764

Date:  October 17, 2011

26

**CERTIFICATE OF SERVICE**

I hereby certify that on October 17, 2011, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification of such filing to all ECF participants.

DYKEMA GOSSETT PLLC


By: /s/ Andrew J. Kolozsvary
    Patrick F. Hickey (P36648)
    Andrew J. Kolozsvary (P68885)
    Attorneys for Plaintiffs
    400 Renaissance Center
    Detroit, MI 48243
    313-568-6764

Date: October 17, 2011

DYKEMA GOSSETT•A PROFESSIONAL LIMITED LIABILITY COMPANY•400 RENAISSANCE CENTER•DETROIT, MICHIGAN 48243

27