**UNTIED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

AJUBA INTERNATIONAL, L.L.C., AJUBA
SOLUTIONS (INDIA) PRIVATE, LTD., and
MIRAMED GLOBAL SERVICES, INC.,

           Plaintiffs,

                            CASE NO. 11-12936

v.

                            HON. MARIANNE O. BATTANI

DEVENDRA KUMAR SAHARIA, ADROIT
GLOBAL SOLUTIONS INDIA PRIVATE
LTD., ADROIT GLOBAL SOLUTIONS,
INC., and AGS HEALTH, INC.,

           Defendants.

_____/

**OPINION AND ORDER**
**GRANTING-IN-PART AND DENYING-IN-PART DEFENDANTS'**
**MOTION TO DISMISS AND DENYING DEFENDANTS' MOTION TO STAY**

This matter is before the Court on Defendants' Motion to Dismiss the Amended

Complaint (Doc. 16) and Motion to Stay (Doc. 17). The Court heard oral argument on

March 8, 2012, and at the conclusion of the hearing took the motions under advisement.

For the reasons that follow, Defendants' motion to dismiss is **GRANTED-IN-PART and**

**DENIED-IN-PART** and their motion to stay is **DENIED.**

**I.**      **STATEMENT OF FACTS**

      **A.**      **Plaintiff Parties – The "Ajuba" Entities**

MiraMed Global Services, Inc. ("MiraMed") is a Michigan corporation having its

principal place of business in Jackson, Michigan. MiraMed owns Ajuba International,

L.L.C. ("Ajuba International"). Ajuba International is a Michigan limited liability company

having its principal place of business in Jackson, Michigan. Ajuba International owns

non-party Ajuba Solutions Mauritius Ltd., which in turn wholly owns Ajuba Solutions (India) Private, Ltd., ("Ajuba India").  Ajuba India is an Indian corporation having its principal place of business in Chennai, India.

Ajuba International and Ajuba India are separate but related entities that, together, provide revenue cycle outsourcing services to healthcare systems, hospitals, academic and medical centers, and billing and receivables management companies. Ajuba International manages business development and is in privity with its clients whereas Ajuba India delivers the back-end services.  In other words, the Ajuba entities are outsourcing companies which handle billing for health care businesses operating in the United States.

**B.    Defendant Parties – Saharia and the "AGS" Entities**

Defendant Devendra Kumar Saharia ("Saharia"), a former Michigan resident, is a citizen and current resident of India.  Defendant Adroit Global Solutions India Private Ltd. ("AGS India") is a corporation organized under the laws of India, having its principal place of business in India.  Adroit Global Solutions, Inc. ("AGS US") is a Delaware corporation that has no operations, assets, or place of business.  AGS Health, Inc. ("AGS Health") is a Delaware corporation, having its principal place of business in New York.

**C.    Saharia's Relationship with the Ajuba Entities**

In 2000, Saharia co-founded Ajuba International's predecessor company.  In July 2005, Saharia sold his ownership stake in that company to MiraMed.  MiraMed would not purchase Saharia's stake unless he signed a three-year employment agreement and a three-year non-compete agreement.  Saharia agreed, executing an Employment

Agreement ("2005 Employment Agreement") and a Noncompetition Agreement ("2005 Noncompetition Agreement") with Ajuba International on July 8, 2005. (Doc. 11 Ex. A; Ex. B)

The 2005 Noncompetition Agreement prohibited Saharia from competing with Ajuba International or soliciting its employees. (Doc. 11 Ex. A at § 2). The agreement further prohibited Saharia from disparaging Ajuba International while the agreement is "in effect and indefinitely thereafter." (Id. at § 4). The agreement also contains confidentiality obligations that purport to survive (ad infinitum) the July 8, 2008 termination date and a Michigan forum selection clause. (Id. at §§ 3, 5(E)).

The 2005 Employment Agreement provided that Saharia was employed as President of Ajuba India and appointed President-International for Ajuba International. (Doc. 11 Ex. B at § 2.1). The agreement expressly acknowledged that the 2005 Noncompetition Agreement was a separate contract not covered or superseded by the subject matter of the Employment Agreement. (Id. at § 9.8). It also contained on-going confidentiality and non-disparagement provisions, as well as a Michigan forum selection clause. (Id. at §§ 3.1, 9.13, 9.15).

Upon the expiration of the 2005 Employment and 2005 Noncompetition Agreements, on November 1, 2008, Saharia entered into a new Employment Agreement ("2008 Employment Agreement") with Ajuba India. (Doc. 11 Ex. C). Ajuba International was not a party to this agreement. It did, however, sign the agreement in its capacity as a parent granting its subsidiary the authority to enter into the contract with Saharia. (Id. at p.10). The 2008 Employment Agreement reflected Saharia's continued employment as President of Ajuba India. Although it contains confidentiality

3

and non-disparagement provisions, it does not include any non-compete or non-solicitation obligations.  (Id. at §§ 3.1, 7.12).  The agreement also contains an integration clause which states that the 2008 Employment Agreement "contains the entire agreement and understanding of the parties and supersedes all prior and contemporaneous agreements, arrangements, and understandings relating to the subject matter of this Agreement entered into between the Company, Parent and the Employee." (Id. at § 7.8).

In January 2009, after fellow co-founder Nader Samii left Ajuba International, Saharia took on all of Samii's duties managing Ajuba International's employees and business processes in the United States.  (Doc. 22 Ex. A at ¶¶ 7-15).  He often negotiated and executed agreements on behalf of Ajuba International and had access to its trade secrets and confidential information.  (Id.).

### D.   Saharia Competes with the Ajuba Entities

On March 31, 2011, Saharia resigned from Ajuba India.  Unbeknownst to Plaintiffs, while serving as President of Ajuba India and acting as an agent or de facto officer of Ajuba International, Saharia established AGS India to compete directly with Plaintiffs.  Saharia orchestrated a covert scheme to secure departures of key management personnel from Ajuba India, interfered with Plaintiffs' business relationships to advance his and AGS' interests, and misappropriated trade secrets and other confidential information.  (Doc. 11 at ¶¶ 69-98).  Armed with Plaintiffs' former employees and trade secrets, Saharia then created the U.S.-based AGS entities and began an international campaign to compete against Plaintiffs.  As a result, at least one

4

major customer has terminated its contract with Ajuba International and transferred that business to Defendants.  (Id. at ¶ 97).

### E.    The Federal Lawsuit

On July 7, 2011, Plaintiffs filed a ten-count Complaint against Defendants in the United States District Court for Eastern District of Michigan.  (Doc. 1).  On October 17, 2011, Plaintiffs filed a First Amended Complaint with eleven counts.  (Doc. 11).  In response, Defendants' filed a Motion to Dismiss under Rules 12(b)(1), (2), (6), and the common law doctrine of forum non conveniens.  (Doc. 16).  Defendants also filed a Motion to Stay under the Colorado River abstention doctrine.  (Doc. 17).  These motions are now before the Court.

### F.    The Indian Lawsuit

On September 8, 2011, Ajuba India filed a related action in the High Court of Judicature at Madras, India, including a thirty-page "plaint" alleging the same conduct as the federal complaint and seeking the similar relief against Saharia and AGS India, plus nineteen other individual parties who reside in India. (Doc. 18 Ex. E).  The other individuals named as defendants are the former employees of Ajuba India who allegedly went to work for AGS India.  Ajuba International and MiraMed are not named as plaintiffs and AGS Heath and AGS U.S. are not named as defendants.

## II.    STANDARDS OF REVIEW

### A.    Defendants' Motion to Dismiss

#### 1.    Rule 12(b)(1)

Under Rule 12(b)(1), a defendant may move to dismiss the action for lack of subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  "Subject matter jurisdiction is

always a threshold determination." American Telecom Co., L.L.C. v. Republic of Lebanon, 501 F.3d 534, 537 (6th Cir. 2007) (citation omitted). The Supreme Court has explained, "Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute . . . [thus] [i]t is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377, (1994) (citations omitted). Accordingly, when the defendant challenges subject matter jurisdiction, the plaintiff bears the burden of establishing jurisdiction. Moir v. Greater Cleveland Regional Transit Auth., 895 F.2d 266, 269 (6th Cir. 1990) (citation omitted).

### 2.    Rule 12(b)(2)

Before an answer is filed, a defendant may move to dismiss for lack of personal jurisdiction over the defendant. Fed. R. Civ. P. 12(b)(2). "Where personal jurisdiction is challenged in a 12(b) motion, the plaintiff has the burden of establishing that jurisdiction exists." Am. Greetings Corp. v. Cohn, 839 F. 2d 1164, 1168 (6th Cir. 1988). A motion to dismiss for lack of personal jurisdiction leaves the Court with three options: "it may decide the motion upon the affidavits alone; it may permit discovery in aid of deciding the motion; or it may conduct an evidentiary hearing to resolve any apparent factual questions." Theunissen v. Matthews, 935 F.2d 1454, 1458 (6th Cir. 1991) (citation omitted). The district court has considerable discretion in this decision and will be reversed only for abuse of discretion. Id. The method the court selects will affect the magnitude of the burden on the plaintiff to avoid dismissal. Serras v. First Tenn. Bank Nat'l Ass'n, 875 F.2d 1212, 1214 (6th Cir. 1989).

6

Where the court relies solely on the parties' affidavits to reach its decision on the motion, the burden rests on the plaintiff to establish only a prima facie showing of jurisdiction in order to avoid dismissal and the court must consider the pleadings and affidavits in the light most favorable to the plaintiff.  CompuServe, Inc. v. Patterson, 89 F.3d 1257, 1262 (6th Cir. 1996).  Further, the court does not weight the controverting assertions of the moving party due to its interest in "prevent[ing] non-resident defendants from regularly avoiding personal jurisdiction simply by filing an affidavit denying all jurisdictional facts."  Id.  (internal quotation marks and citation omitted).

### 3.       Rule 12(b)(6)

A complaint may be dismissed under Rule 12(b)(6) for failure to state a claim if "'it fails to give the defendant fair notice of what the . . . claim is and the ground upon which it rests.'"  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).  A complaint need not contain detailed factual allegations, but it must include more than labels and conclusions.  Twombly, 550 U.S. at 555; Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  A court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face."  Twombly, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 129 S.Ct. at 1949.  The Court must accept the well-pleaded factual allegations as true.  Hensley Mfg. V. ProPride, Inc., 579 F.3d 603 (6th Cir. 2009) (citing Twombly, 550 U.S. at 555).  Although the plausibility standard is not equivalent to a "'probability

7

requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting Twombly, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-that the pleader is entitled to relief." Iqbal, 129 S.Ct. at 1950 (quoting F.R. Civ. P. 8(a)(2)).

### 4.    Forum Non Conveniens

Pursuant to the common law doctrine of forum non conveniens, a district court may decline to exercise jurisdiction over a case when a foreign tribunal can more appropriately conduct the litigation. Zions First Nat. Bank v. Moto Diesel Mexicana, S.A. de C.V., 629 F.3d 520, 523 (6th Cir. 2010) (citing Piper Aircraft Co. v. Reyno, 454 U.S. 235, 250 (1981); Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 507-08 (1947)). In reviewing a request to dismiss under this doctrine, the court must determine: (1) whether defendant has established that there is an adequate alternative forum; and (2) whether the private interests of the litigants and factors of public interest in plaintiff's chosen forum, versus the alternative forum weigh in favor of dismissal. Ridley Bagel, Ltd. v. Kellogg Co., 233 F. Supp. 2d 853, 856 (E.D. Mich. 2002).

### B.    Defendant's Motion to Stay

#### 1.    Colorado River Abstention

Under the doctrine of abstention set forth in Colorado River Water Conservation Dist. v. U. S., 424 U.S. 800 (1976), a federal court may decline to exercise or postpone the exercise of jurisdiction over a case in light of a parallel proceeding in another jurisdiction. "Abstention from the exercise of federal jurisdiction is the exception, not the rule." Id. at 813. A court may defer to a parallel proceeding only in the rare situations

where abstaining would strongly promote judicial economy and a "comprehensive disposition" of the litigation.  Colorado River, 424 U.S. at 817–18; see also Romine v. Compuserve Corp., 160 F.3d 337, 339 (6th Cir.1998).

## III.   ANALYSIS

### A.   Defendants' Motion to Dismiss

Defendants moved for dismissal based on Rules 12(b)(1), (2), (6), and the common law doctrine of forum non conveniens.  The Court considers the jurisdiction issues first, since the Rule 12(b)(6) and forum non conveniens challenges become moot if the Court lacks either personal or subject matter jurisdiction. See Moir v. Greater Cleveland Regional Transit Auth., 895 F.2d 266, 269 (6th Cir. 1990).

#### 1.   Personal Jurisdiction

The main issue in this case is whether the Court may exercise limited personal jurisdiction over Defendants.  The personal jurisdiction analysis requires a two-step inquiry.  Air Products and Controls, Inc. v. Safetech Int'l, Inc., 503 F.3d 544, 550 (6th Cir. 2007); see also Green v. Wilson, 565 N.W.2d 813, 815 (Mich. 1997).  First, "the court must determine whether any of Michigan's relevant long-arm statutes authorize the exercise of jurisdiction over Defendants; and, if so, [second] the court must determine whether exercise of that jurisdiction comports with constitutional due process." Air Products, 503 F.3d at 550.

##### a.   Michigan's Long-Arm Statute

Regarding the first step of the inquiry, Plaintiffs offer only one argument that applies to all Defendants; the Court may exercise limited personal jurisdiction under Sections 600.705(2) and 600.715(2) of Michigan's long-arm statute because each

Defendant has engaged in tortious conduct that has caused consequences in Michigan. These sections provide that a court has limited personal jurisdiction over non-resident defendants who "do[ ] or caus[e] an act to be done, or consequences to occur, in the state resulting in an action for tort." MICH. COMP. LAWS § 600.705(2) (covering individuals); § 600.715(2) (covering corporations). To come within the plain language of these sections, the defendants' tortious conduct or the injury caused by that conduct must occur in Michigan. Bagsby v. Gehres, 195 F.Supp.2d 957, 963 (E.D. Mich. 2002) (citing Green, 565 N.W.2d at 817).

Defendants argue they did not engage in any tortious conduct in Michigan and there are no tortious effects in Michigan. Defendants base this argument on the idea that whatever alleged injury was done, it was done only to Ajuba India in India, adding that there are no facts to show that Plaintiffs suffered any harm in Michigan. In other words, Defendants invite the Court to ignore the specific facts set forth in Plaintiffs' pleadings, briefs, and exhibits and the inferences that flow from these particular facts. Indeed, Defendants' entire personal jurisdiction argument is built around the premise that the First Amended Complaint is void of any facts which show that the Michigan-based companies have any cause of action against Defendants. The Court rejects this assumption because for the purposes of this motion, it interprets the facts in a light most favorable to the nonmovant and it may not consider facts that conflict with those offered by Plaintiffs. See Nartron Corp. v. Quantum Research Group, Ltd., 473 F.Supp.2d 790, 797 (E.D. Mich. 2007) (citing Neogen Corp. v. Neo Gen Screening, Inc., 282 F.3d 883, 887 (6th Cir. 2002)); see also Serras v. First Tennessee Bank Nat'l Ass'n, 875 F.2d 1212, 1215 (6th Cir. 1989) (holding that if a plaintiff's pleadings and affidavits state the

10

facts with "sufficient particularity," a court must ignore contrary assertions by a defendant).

Upon considering Plaintiffs' factual allegations under the appropriate standard of review, the Court finds they have satisfied their burden of showing that Defendants have engaged in conduct that has caused tortious injury in Michigan.  Defendants are alleged to have misappropriated Ajuba International's trade secrets and confidential information and tortiously interfered with its contracts and business relationships, thereby causing consequences in Michigan resulting in an action for tort.  (Doc. 11 at  ¶¶ 63-68, 82-98; Doc. 22 Ex. A at ¶¶ 13, 16).   As part of the alleged scheme, Saharia concealed his activities on behalf of the AGS entities while acting as an agent of Ajuba International, misrepresenting material facts concerning the status of client and employee relationships and his own activities.  (Doc. 11 at  ¶¶ 71-80).  This conduct gives rise to an action for breach of fiduciary duties in Michigan.  Accordingly, the Court finds that Sections 600.705(2) and 600.715(2) of Michigan's long-arm statute authorize the exercise of limited personal jurisdiction over Defendants.   Having concluded these sections authorize personal jurisdiction over all Defendants, the Court does not address Plaintiffs' remaining long-arm arguments relating only to Defendant Saharia.  The Court now turns to the second step of the personal jurisdiction inquiry, the due process analysis.

### b.    Due Process

Although Michigan's long-arm statute authorizes limited personal jurisdiction over Defendants, the Court cannot exercise personal jurisdiction in violation of Defendants' constitutional right to due process.  <u>Neogen</u>, 282 F.3d at 889.   To show that the

exercise of personal jurisdiction comports with due process, Plaintiffs must "establish with reasonable particularity sufficient 'minimum contacts' with Michigan so that the exercise of jurisdiction over Defendants would not offend 'traditional notions of fair play and substantial justice.'"   Id. (quoting Int'l Shoe v. Washington, 326 U.S. 310, 316 (1945)).  To meet this burden in the Sixth Circuit, Plaintiffs must satisfy a three-part test:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there.  Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

Id. (quoting S. Mach. Co. v. Mohasco Indus., Inc., 401 F.2d 374, 381 (6th Cir. 1968)).

Starting with the first part of the test, "purposeful availment" is considered the "constitutional touchstone" of limited personal jurisdiction, existing when a defendant's contacts with a forum state "proximately result from action by the defendant himself that create a substantial connection with the forum state, and where the defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there." Neogen, 282 F.3d at 889 (internal citations and alteration omitted); see also Intera Corp. v. Henderson, 428 F.3d 605, 616 (6th Cir. 2005) (describing "purposeful availment" as "essential" to a finding of limited personal jurisdiction).  The "purposeful availment" requirement "ensures that a defendant will not be haled into a jurisdiction solely the result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person." Neogen, 282 F.3d at 889 (internal quotation marks and citation omitted).

Defendants maintain the "purposeful availment" requirement is not satisfied because there are no facts to show that Defendants availed themselves of acting in

12

Michigan, the alleged "bad-acts" had effects only in India, and Saharia's contacts with Ajuba International and MiraMed in Michigan should be considered de minimums.  Like their argument under the long-arm statute, Defendants ask the Court to adopt factual assumptions in their favor and disregard Plaintiffs' allegations.  The controlling standard of review prohibits the Court from taking such action.

When viewed in a light most favorable to Plaintiffs, the record shows that Defendants purposefully availed themselves of acting in Michigan or causing consequences to be felt in Michigan.  As for Saharia, he conducted business on behalf of Ajuba International and was in continuous contact with MiraMed regarding the nature of that business.  (Doc. 11 at ¶ 45-60; Doc. 22 Ex. A at ¶¶ 14-16).  Saharia visited Michigan on more than one occasion and had a Michigan area code on his business phone.  (Doc. 22 Ex. A at ¶ 12).  As part of the consideration for MiraMed's purchase of Ajuba International's predecessor company, Saharia  signed employment and non-compete agreements that both contained on-going confidentiality and non-disparagement provisions, as well as a Michigan forum selection clause.  (Doc. 11 Ex. A; Ex. B).  These contacts with Michigan are not random, fortuitous, or attenuated.

Further, all Defendants reached into Michigan as part of their tortious scheme to unfairly compete against Plaintiffs.  As discussed above, while acting as a fiduciary of Ajuba International, Saharia covertly acted in the interests, and on behalf of, the AGS entities.  Saharia directed fraudulent and misleading communications to MiraMed and misappropriated Ajuba International's trade secrets and confidential information as part of this scheme.   Defendants then used the misappropriated information to unfairly compete with Plaintiffs.  Engaging in such conduct provides "fair warning" to Defendants

13

that they may have to defend a lawsuit in Michigan.  See <u>Youn v. Track, Inc.</u>, 324 F.3d 409, 418 (6th Cir. 2003) ("A defendant has 'purposefully availed' himself of a forum by engaging in activity that should provide 'fair warning' that he may have to defend a lawsuit there" (internal quotation marks and citation omitted)).  This conduct undeniably connects Defendants with Michigan.  See <u>Bridgeport Music, Inc. v. Still N The Water Pub</u>, 327 F.3d 472, 478-479 (6th Cir. 2003) ("The emphasis in the purposeful availment inquiry is whether the defendant has engaged in some overt actions connecting the defendant with the forum state.").  Since Defendants' undertook actions to cause effects in Michigan, the "purposeful availment" element of the due process analysis is satisfied. See <u>Air Products</u>, 503 F.3d at 553 (the existence of intentional tortious conduct directed at a forum resident "enhances" a defendant's contacts with the forum state for purposes of a purposeful availment analysis).

The second part of the due process test is also satisfied; an overwhelming majority of Plaintiffs' claims arise from Defendants' contacts with Michigan.  The breach of contract claim arises directly out of Saharia's 2005 Noncompetition Agreement with Ajuba International.  As for the tort claims, Saharia accessed Ajuba International's trade secrets and customer relationships through his status as an agent and de facto officer of Ajuba International to benefit himself and the AGS entities.  Defendants took advantage of Saharia's relationship with Ajuba International by advancing their conspiracy of misappropriation and unfair competition while Saharia was still representing himself as an agent of Ajuba International.  These misrepresentations enabled Defendants to move forward with their objectives in secret, prolonging their ability to access trade secrets and manipulate customer and employee relationships to

14

Plaintiffs' detriment.   But for these relationships with Michigan-based companies, Defendants' scheme of wrongdoing would not be possible and a substantial majority of Plaintiffs' claims would not exist.   Accordingly, Defendants' conduct satisfies the second prong of the due process test.   See Mohasco, 401 F.2d at 384 n. 29 (a cause of action "arises from" a defendant's activities in a forum where the operative facts of the controversy relate to the defendant's contacts with that forum).

As to the third "reasonableness of jurisdiction" part of the test, "[a]n inference arises that the third factor is satisfied if the first two requirements are met."   Bird v. Parsons, 289 F.3d 865, 875 (6th Cir. 2002); CompuServe, 89 F.3d at 1268. Notwithstanding this inference, courts often look at several factors when examining the reasonableness requirement, including "the burden on the defendant, the interest of the forum state, the plaintiff's interest in obtaining relief, and the interests of other states in securing the most efficient resolutions of controversies."   Am. Greetings, 839 F.2d at 1169-1170 (citing Asahi Metal Indus. v. Superior Court, 480 U.S. 102, 113 (1987)). However, "[w]hen minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant."   Asahi, 480 U.S. at 114.   Consequently, "where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable."   Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477 (1985).

The Court finds it reasonable to exercise limited personal jurisdiction over Defendants.   Michigan's interest in protecting its citizens from unfair competition and

Plaintiffs' interest in obtaining an efficient resolution of this dispute outweighs Defendants' burden of having to litigate in this forum.  Saharia is a fluent English speaker who was educated in the United States, worked here for decades, and resided in Michigan for years.  Defendants have offices in the United States and able counsel. Plaintiffs state Saharia frequently travels to the United States and has a residence in Hoboken, New Jersey.  (Doc. 22 Ex. B; Ex. C).  Defendants' contacts with Michigan companies, and the corresponding harm directed to them, shows that Michigan has a strong interest in, and substantial connection to, this dispute.  That Saharia resides in India does not mean that it would be unreasonable for the Court to exercise jurisdiction over him and the AGS entities.  See Asahi, 480 U.S. at 114.  Although Ajuba India has filed suit in India, Ajuba International and MiraMed are not Plaintiffs in that case and their claims will not be resolved in that litigation.  Relatedly, Defendants have not shown that the burdens on them of litigating here would be any greater than those on Ajuba International and MiraMed litigating in India.  Therefore, the exercise of limited personal jurisdiction over Defendants is reasonable.

### 2.    Subject Matter Jurisdiction and Rule 12(b)(6)

Having concluded that it may exercise limited personal jurisdiction over Defendants, the Court next considers whether it has subject matter jurisdiction.  The parties' positions on this issue are intimately intertwined with their Rule 12(b)(6) arguments.  Plaintiffs' assert the Court has subject matter jurisdiction because a federal question is present in Count VII, a claim under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA"), and there is diversity of citizenship under 28 U.S.C. § 1332(a)(3).  (Doc. 11 at ¶¶ 9-10).  Defendants dispute both alleged bases.  First, they

maintain there is no federal question because Count VII fails to state a viable CFAA claim.   Second, they explain that if the Court agrees with their Rule 12(b)(6) analysis and dismisses all of Ajuba International and MiraMed's claims, there is no jurisdiction under any subsection of the diversity statute because this case would then "boil down" to a dispute between an Indian corporation located in India (Ajuba India) versus two Indian citizens, located in India (Saharia and AGS India) and two U.S. citizens (AGS U.S. and AGS Health).   Accordingly, the Court must resolve the Rule 12(b)(6) issues before considering the question of subject matter jurisdiction.   The Court begins with the federal question issue.

### a.      Federal Question and the CFAA Claim

Plaintiffs' bring a CFAA claim against all Defendants in Count VII.   Although originally intended as a criminal statute to combat computer hacking, the CFAA explicitly authorizes "[a]ny person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief."   18 U.S.C. § 1030(g).

The CFAA prohibits seven types of conduct with respect to unauthorized access of computers.   See 18 U.S.C. § 1030(a)(1)-(7).   Here, it appears Plaintiffs are asserting that Defendants violated subsection (a)(2)(C) of 18 U.S.C. § 1030, which prohibits "intentionally access[ing] a computer without authorization or exceed[ing] authorized access, and thereby obtain[ing] . . . information from any protected computer"; subsection (a)(4), which prohibits "knowingly and with intent to defraud, access[ing] a protected computer without authorization, or exceed[ing] authorized access, and by means of such conduct further[ing] the intended fraud and obtain[ing] anything of value";

17

and subsection (a)(5)(B), which provides for liability on the part of any person who "intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage."

As the above subsections make clear, Plaintiffs must show that Defendants' accessed a "protected computer" either "without authorization" or in a manner that "exceeds authorized access."   A "protected computer" is any computer "used in or affecting interstate or foreign commerce or communication." 18 U.S.C. § 1030(e)(2)(B). Although the CFAA does not define the term "authorization," it does provide that "exceeds authorized access" means "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter." Id. at § 1030(e)(6).

Plaintiffs must also show that they sustained "damage" or "loss" as the CFAA defines those terms.   Id. at § 1030(g).   The statute defines "damage" as "any impairment to the integrity or availability of data, a program, a system, or information." Id. at § 1030(e)(8).  The term "loss" means "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." Id. at § 1030(e)(11).

Further, Plaintiffs' CFAA claim must be based upon "conduct involv[ing] 1 of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i)." Id. at § 1030(g). The only subclause in the referenced subsection that is relevant to the present

claim requires the showing of "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value." Id. at § 1030(c)(4)(A)(i)(I).

Defendants argue Plaintiffs fail to state a valid CFAA claim because they cannot establish that Saharia accessed their computers "without authorization" or in a manner which "exceed[ed] authorized access" given that they granted him complete, unrestricted access to their computer systems due to the nature of his employment. Plaintiffs' maintain this argument ignores the allegations that Saharia accessed and used information stored on Plaintiffs' computers for the improper purpose of competing against Plaintiffs, directly in violation of his confidentiality obligations, contractual obligations, and fiduciary duties of loyalty. According to Plaintiffs, Saharia lost any authorization he had to access Plaintiffs' computers, or, at least, exceeded his authorization when he accessed the computers in violation of confidentiality and use limitations.

The parties' dispute reflects a nationwide split of authority concerning the proper interpretation of the terms "without authorization" and "exceeds authorized access." The split arises from cases in which an employer brings a CFAA claim against an employee who accesses the employer's computer to misappropriate confidential or proprietary business information to start a competing business venture or join a competitor. Courts around the country struggle with whether the CFAA applies in a situation where an employee who had been granted access to his employer's computers uses that access for an improper purpose. The split of authority specifically originates from competing interpretations of the terms "without authorization" and "exceeds authorized access," the statutory predicates for liability.

19

Some courts have construed the terms narrowly, holding that an employee's misuse or misappropriation of an employer's business information is not "without authorization" so long as the employer has given the employee permission to access such information.  See LVRC Holdings L.L.C. v. Brekka, 581 F.3d 1127 (9th Cir. 2009) (holding that that the CFAA targets the unauthorized procurement or alteration of information rather than its misuse); Orbit One Commc'ns, Inc. v. Numerex Corp., 692 F.Supp.2d 373, 385 (S.D. N.Y. 2010) ("The plain language of the CFAA supports a narrow reading.  The CFAA expressly prohibits improper 'access' of computer information.  It does not prohibit misuse or misappropriation."); Shamrock Foods Co. v. Gast, 535 F.Supp.2d 962, 965 (D. Ariz. 2008) ("[T]he plain language of the CFAA "target[s] the unauthorized procurement or alteration of information, not its misuse or misappropriation."); Int'l Ass'n of Machinists & Aerospace Workers v. Werner–Masuda, 390 F.Supp.2d 479, 499 (D. Md. 2005) ("[T]he CFAA, however, do[es] not prohibit the unauthorized disclosure or use of information, but rather unauthorized access.").  In other words, courts adopting the narrow approach hold that, once an employee is granted "authorization" to access an employer's computer that stores confidential company data, that employee does not violate the CFAA regardless of how he subsequently uses the information.

Other courts have construed the terms broadly, finding that the CFAA covers violations of an employer's computer use restrictions or a breach of the duty of loyalty under the agency doctrine.  See United States v. Rodriguez, 628 F.3d 1258(11th Cir. 2010); United States v. John, 597 F.3d 263 (5th Cir. 2010); Int'l Airport Ctrs., L.L.C. v. Citrin, 440 F.3d 418 (7th Cir. 2006); EF Cultural Travel BV v. Explorica, Inc., 274 F.3d

577 (1st Cir. 2001).  The broad approach holds that "an employee accesses a computer 'without authorization' whenever the employee, without the employer's knowledge, acquires an interest that is adverse to that of his employer or is guilty of a serious breach of loyalty."  Guest-Tek Interactive Entm't, Inc. v. Pullen, 665 F.Supp.2d 42, 45 (D. Mass. 2009) (citations omitted).

Although the Sixth Circuit has not squarely addressed the meaning of "without authorization" or "exceeds authorized access" in the context of an employment dispute, the court favored the narrow interpretation in Pulte Homes, Inc. v. Laborers' Intern. Union of N. Am., 648 F.3d 295, 299 (6th Cir. 2011).  In Pulte, the court affirmed the dismissal of a CFAA claim against a defendant labor union who bombarded a plaintiff home builder with spam emails and voicemails in response to its firing of a union employee.  Id. at 303.  The court found that the defendant's use of unprotected public communication systems to contact the plaintiff defeated the allegation that it accessed the plaintiff's computers "without authorization" under the CFAA.  Id. at 304.  In reaching this conclusion, the court interpreted the terms "without authorization" and "exceeds authorized access" consistent with the narrow approach, citing Brekka as persuasive authority.  Id.  Accordingly, Pulte suggests the Sixth Circuit would adopt a narrow interpretation of the CFAA when the issue presents itself in the context of an employment dispute such as the present case.

Moreover, at least two district courts in the Sixth Circuit have specifically confronted the split of authority and expressly adopted the narrow approach.  See ReMedPar, Inc. v. AllParts Med., L.L.C., 683 F. Supp. 2d 605, 609 (M.D. Tenn. 2010); Black & Decker, Inc. v. Smith, 568 F. Supp. 2d 929 (W.D. Tenn. 2008); see also Am.

21

Family Mut. Ins. Co. v. Rickman, 554 F.Supp.2d 766, 771 (N.D. Ohio 2008) (suggesting in dicta that the narrow approach is preferred, noting that "[t]he statute was not meant to cover the disloyal employee who walks off with confidential information.  Rather, the statutory purpose is to punish trespassers and hackers. . . .").

After reviewing each line of authority, the Court finds the narrow interpretation the better reasoned approach.   The Court agrees with the three rationales offered in support of this view: (1) the plain meaning of the statute compels a court to interpret "authorization" narrowly; (2) the rule of lenity and the statutory canon of avoiding absurd results favor a narrow construction; and (3) the legislative history and congressional intent support such a finding.   See Brekka, 581 F.3d at 1132-33 (engaging in a plain meaning analysis of "without authorization" and "exceeds authorized access"); Bell Aerospace Servs., Inc. v. U.S. Aero Servs., Inc., 690 F. Supp. 2d 1267, 1272 (M.D. Ala. 2010) (applying the rule of lenity and the canon of avoiding absurd results); ReMedPar, 683 F.Supp. 2d at 613 (discussing legislative history of the CFAA).

The Court also agrees with the primary criticisms of the broad interpretation:

[Cases adopting the broad approach] identify no statutory language that supports interpreting the CFAA to reach misuse or misappropriation of information that is lawfully accessed.  Instead, they improperly infer that "authorization" is automatically terminated where an individual exceeds the purposes for which access is "authorized."   But the definition of "exceeds authorized access" in § 1030(e)(6) indicates that Congress did not intend to include such an implicit limitation in the word "authorization." The interpretation of the CFAA adopted in this line of cases would require an analysis of an individual's subjective intent in accessing a computer system, whereas the text of the CFAA calls for only an objective analysis of whether an individual had sufficient "authorization."   While a confidentiality agreement or other policies or obligations owed to an employer may prohibit misuse of a company's internal computer system or misappropriation of confidential information therein, the plain text of the CFAA does not.

22

> Furthermore, an interpretation of the CFAA based upon agency principles would greatly expand the reach of the CFAA to any employee who accesses a company's computer system in a manner that is adverse to her employer's interests.  This would convert an ordinary violation of the duty of loyalty or of a confidentiality agreement into a federal offense.  An employee does not lose "authorization" by accessing a computer with an improper purpose; rather, authorization is controlled by the employer, who may or may not terminate or restrict an employee's access privileges.

U.S. v. Aleynikov,  737 F.Supp.2d 173, 193 (S.D. N.Y. 2010) (internal quotation marks and citations omitted).

Accordingly, a violation for accessing "without authorization" under the CFAA occurs only where initial access is not permitted and a violation for "exceeding authorized access" occurs only where initial access is permitted but the access of certain information is not permitted.  See ReMedPar, 683 F.Supp. 2d at 613; Black & Decker, 568 F.Supp.2d at 935; Shamrock, 535 F.Supp.2d at 965.

Returning to Count VII, the Court finds that Plaintiffs fail to state a viable CFAA claim.  Plaintiffs granted Saharia unrestricted access to their computers, confidential information and trade secrets.  (Doc. 11 at ¶¶ 63-68).  Since they authorized Saharia to access the computers which stored information he later misappropriated, Plaintiffs cannot successfully argue that his access was "without authorization" or in "excess of authority" under the CFAA.  Relatedly, there are no facts pled to show that the AGS entities, its agents or employees even accessed Plaintiffs' computer systems.  The Court also rejects the suggestion that Saharia subjectively "acted as" the AGS entities while accessing Plaintiffs computer system.  Therefore, the CFAA claim is subject to a Rule 12(b)(6) dismissal on the grounds that Plaintiffs have not alleged facts sufficient to establish an essential element of that claim, that is, that access to Plaintiffs' computers was either "without authorization" or in excess of authority previously granted.

23

Having concluded that dismissal of the single federal claim asserted is warranted, the Court does not have federal question jurisdiction over this case. The Court must now consider whether it has subject matter jurisdiction under the diversity statute.

### b.        Diversity Jurisdiction and the Remaining Claims

Defendants argue there is no subject matter jurisdiction under the diversity statute because all remaining claims asserted by Ajuba International and MiraMed fail to state a claim, thereby leaving a foreign citizen, Ajuba India, as the sole plaintiff party. Under such a scenario, i.e., only a foreign plaintiff with claims against both foreign and U.S. citizen defendants, there would be no diversity jurisdiction. See U.S. Motors v. Gen. Motors Europe, 551 F.3d 420, 422-424 (6th Cir. 2008). Accordingly, the Court addresses Defendants' Rule 12(b)(6) challenges to the remaining claims to determine whether diversity jurisdiction exists.

### i.        Breach of Fiduciary Duties Claims

Ajuba International has pled a viable breach of fiduciary duties claim against Saharia. Although the expiration of the 2005 Employment Agreement ended Saharia's contractual relationship with Ajuba International, the pleadings set forth numerous facts showing that he acted as an agent and de facto officer of Ajuba International after that agreement expired, thereby giving rise to fiduciary duties owed to that Michigan company. (Doc. 11 at ¶¶ 46-61). The allegations show a plausible claim that Saharia owed fiduciary duties to Ajuba International and breached these duties as a result his conduct in setting up the competing business. Further, since the inquiry as to whether a fiduciary relationship exists is fact-specific, a claim alleging the existence and breach

24

of fiduciary duties is generally not subject to dismissal under Rule 12(b)(6).  <u>See</u> <u>Antioch Litigation Trust v. McDermott Will & Emery L.L.P.</u>, 738 F.Supp.2d 758, 772 (S.D. Ohio 2010).

As for Ajuba India, the Court rejects Defendants' suggestion that it cannot bring a breach of fiduciary duties claim against Saharia because the claim would be "duplicative" of its claim for breach of the 2008 Employment Agreement and misappropriation of trade secrets.  Under Rule 8, "a pleading does not become insufficient by reason of a party having made alternative, or even contradictory, claims." <u>Detroit Tigers, Inc. v. Ignite Sports Media, L.L.C.</u>,  203 F.Supp.2d 789, 793 (E.D. Mich. 2002) (citing <u>Rowe v. Cleveland Pneumatic Co.</u>, 690 F.2d 88, 92 (6th Cir.1982).

Ajuba India's tort claim also withstands Defendants' motion because the allegations show that Saharia violated a legal duty separate and distinct from his obligations under the 2008 Employment Agreement.  In order for an action in tort to arise out of a breach of contract under Michigan law, the body of law the parties apply to this claim, the alleged wrongful act must constitute "(1) a breach of duty separate and distinct from the breach of contract and (2) active negligence or misfeasance." <u>Spengler v. ADT Sec. Serv.</u>, 505 F.3d 456, 457-58 (6th Cir. 2007).   Here, though the 2008 Employment Agreement does not prohibit Saharia, the President of the company, from competing against Ajuba India or soliciting its employees, the duties of good faith and loyalty certainly prohibit such action.  At this stage in the proceedings, Ajuba India has stated a plausible claim for breach of fiduciary duties against Saharia.  Relatedly, Plaintiffs also state a plausible claim that the AGS entities aided and abetted Saharia's breach of fiduciary duties.

### ii. Breach of Contract Claims

Plaintiffs bring two contract claims against Saharia: (1) breach of the 2005 Noncompetition Agreement and (2) breach of the 2008 Employment Agreement. Defendants do not dispute that Ajuba India has pled a viable breach of contract claim under the 2008 Employment Agreement. (Doc. 16 at p. 28). They do, however, vigorously dispute whether Ajuba International has a plausible claim under the 2005 Noncompetition Agreement.

In that claim, Plaintiffs allege Saharia breached the on-going confidential and non-disparagement provisions of the 2005 Noncompetition Agreement. (Doc. 11 at ¶¶ 111-112). Defendants insist no claim can be maintained under that agreement because the 2008 Employment Agreement "supersedes all prior and contemporaneous agreements, arrangements, and understandings relating to the subject matter of this Agreement entered into between the [Ajuba India], [Ajuba International] and [Saharia]." (Doc. 11 Ex. C at § 7.8). According to Defendants, the plain language of the integration clause provides that the 2008 Employment Agreement terminates all confidential and non-disparagement provisions contained in the 2005 Noncompetition Agreement.

Plaintiffs argue the integration clause does not affect these provisions because they are unrelated to the "subject matter" of the 2008 Employment Agreement. Plaintiffs assert the "subject matter" of the 2008 Employment Agreement is Saharia's employment relationship only with Ajuba India, which does not concern his confidentiality and non-disparagement obligations owed to Ajuba International under the 2005 Noncompetition Agreement. Plaintiffs add that the parties to the 2008

Employment Agreement did not intend to leave Saharia free of any on-going contractual obligations owed to Ajuba International.

In reviewing a Rule 12(b)(6) motion to dismiss, "the Court may resolve issues of contract interpretation when the contract is properly before the Court, but must resolve all ambiguities in the contract in Plaintiffs' favor." Serdarevic v. Centex Homes, L.L.C., 760 F.Supp.2d 322, 328 (S.D. N.Y. 2010) (citations omitted). "A contract is ambiguous if its words may reasonably be understood in different ways." UAW-GM Human Res. Ctr. v. KSL Recreation Corp., 579 N.W.2d 411, 414 (Mich. Ct. App. 1998) (internal quotation marks and citation omitted). A court should not choose between reasonable interpretations of ambiguous contract provisions when considering a motion to dismiss under Rule 12(b)(6). McKee Foods Corp. v. Pitney Bowes, Inc., No. 06-80, 2007 WL 896153, *3 (E.D. Tenn. March 22, 2007). In other words, "[t]he construction of ambiguous contract provisions is a factual determination that precludes dismissal on a motion for failure to state a claim." Martin Marietta Corp. v. Int'l Telecomm. Satellite Org., 991 F.2d 94, 97 (4th Cir. 1992) (citation omitted).

Here, the parties offer equally compelling reasonable interpretations of the integration clause. The Court finds the controlling interpretation a close call. However, in the context of Rule 12(b)(6), Plaintiffs need only plead facially plausible claims to survive dismissal and the Court construes all well-pleaded facts liberally in their favor. Based upon its review of the pleadings and agreements attached thereto, the Court finds the breach of the 2005 Noncompetition Agreement claim relies on a reasonable interpretation of the integration clause found in the 2008 Employment Agreement. Accordingly, this claim "contain[s] sufficient factual matter, accepted as true, to state a

claim [for] relief that is plausible on its face." Courie v. Alcoa Wheel & Forged Prods., 577 F.3d 625, 629 -630 (6th Cir 2009) (internal quotation marks and citation omitted); see also W. Refining Yorktown, Inc. v. BP Corp. N. Am. Inc., 618 F.Supp.2d 513, 526–27 (E.D. Va. 2009) (denying Rule 12(b)(6) motion to dismiss because the parties advanced reasonable interpretations of ambiguous contract provisions and extrinsic evidence not presently before the court was necessary to resolve the ambiguity).

### iii.    Tortious Interference Claims

The parties dispute whether Plaintiffs have stated tortious interference claims. Under Michigan law, "tortious interference with a contract or contractual relations is a cause of action distinct from tortious interference with a business relationship or expectancy." Health Call of Detroit v. Atrium Home & Health Care Servs., Inc., 706 N.W.2d 843, 848 (Mich. Ct. App. 2005) (citations omitted).  The elements of the former are "(1) the existence of a contract, (2) a breach of the contract, and (3) an unjustified instigation of the breach by the defendant." Id. at 849.  Whereas elements of the later include (1) the existence of a valid business relationship or expectancy that is not necessarily based on an enforceable contract; (2) knowledge of the relationship or expectancy on the part of the defendant; (3) an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy; and (4) resulting damage to the party whose relationship or expectancy was disrupted. Id.

The Court finds Plaintiffs have sufficiently pled both varieties of tortious interference claims.  Plaintiffs have alleged facts supporting the claim that Defendants have tortiously interfered with their contracts, business relationships with customers, and employees. (Doc. 11 at ¶¶ 76-81, 119-124).  Notably, Plaintiffs have specifically

alleged that one of Plaintiffs' most important customers abruptly terminated its contract and transferred that work to the AGS entities. (Id. at ¶97). Plaintiffs also alleged Defendants actively induced business disruption by using misappropriated trade secrets, improperly enticing away valuable employees, and disparaging Plaintiffs. (Id. at ¶¶ 90-94, 121). Accordingly, Plaintiffs have stated viable tortious interference claims.

### iv.    Misappropriation of Trade Secrets

Plaintiffs allege Defendants misappropriated a variety of their trade secrets, including "lists of present, past and prospective clients, credit and financial data concerning such clients, client proposals, price lists and data relating to pricing of products or services, and sales activities, procedures, and techniques." (Doc. 11 at ¶ 126). Defendants argue the Court should dismiss this claim because Plaintiffs have not pled their alleged trade secrets with sufficient particularity, nor have they pled specific facts to show that Defendants actually used the trade secret information.

As a threshold matter, the Court notes that the Michigan Uniform Trade Secrets Act ("MUTSA") governs the contours of Plaintiffs' misappropriation claim because the MUTSA "displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret." MICH. COMP. LAWS § 445.1908(1); see also CMI Int'l, Inc. v. Intermet Int'l Corp., 649 N.W.2d 808 (Mich. Ct. App. 2002). To state a valid MUTSA claim, the plaintiff must allege that (1) it has protectable trade secrets and (2) the defendant improperly acquired, disclosed, or used those trade secrets. Federal-Mogul World Wide, Inc. v. Mahle GmbH, No. 11-10675, 2011 WL 4485080, *13 (E.D. Mich. September 27, 2011) (citations omitted).

The MUTSA "provides broad protection for trade secrets, and sets a relatively low bar for pleading misappropriation."  Dow Corning Corp. v. RSI Silicon Products, L.L.C., No. 10-11226, 2010 WL 4723428, *5 (E.D. Mich. November 15, 2010). Consistent with this expansive scope of protection and the Rule 12(b)(6) standard of review, courts in Eastern District of Michigan have not required the specificity sought by Defendants at the pleading stage.  The courts in Interactive Solutions Group, Inc. v. Autozone Parts, Inc., No. 11-13182, 2012 WL 1288173, *3 (E.D. Mich., J. Cox April 16, 2012) and Compuware Corp. v. Inter. Bus. Machines, 259 F.Supp.2d 597, 605 (E.D. Mich., J. Steeh 2002) held that while a plaintiff will have to identify the alleged trade secrets with particular specificity in order to prove a MUTSA claim, that is simply not the standard required to plead the claim.  Relatedly, "a plaintiff need not plead that the defendant 'used' the trade secret or benefitted from it in any way."  Dow Corning Corp., 2010 WL 4723428, *5.  Misappropriation can be established by pleading improper acquisition, disclosure, or use of a trade secret.  Id. at * 3 (citing MICH. COMP. LAWS § 445.1902(b)).

The Court finds the approaches taken in Autozone and Compuware to be the proper course of action when a defendant seeks dismissal of MUTSA claim for failure to plead the alleged trade secrets with sufficient specificity.  The Court also agrees with the holding in Dow Corning that a plaintiff need not specifically allege how a defendant used its trade secrets because misappropriation can be pled through other means. Therefore, specific allegations concerning the precise identification of Plaintiffs' trade secrets at issue or how Defendants used those trade secrets are not necessary at the pleading stage.  As pled, the misappropriation of trade secrets claim alleges sufficient

facts and circumstantial evidence to allow the Court to draw a reasonable inference that Defendants are liable for the misconduct alleged.   Iqbal, 129 S.Ct. at 1949. Accordingly, the Court declines to dismiss this claim for insufficient specificity.

### v.   Fraud Claims

Plaintiff alleges Saharia committed fraud and "silent" fraud because his intentional concealment and material misrepresentations caused Plaintiffs to rely on the false impression that Saharia was still acting in Plaintiffs' best interests, when in reality he was working directly against them.  Defendants argue a fraud claim does not exist simply because an at-will employee, such as Saharia under the 2008 Employment Agreement, does not tell his employer that he is planning to quit and start his own business.

The Court disagrees with Defendants' marginalization of Plaintiffs' fraud claims. The claims here are based on the allegations that Saharia fraudulently misrepresented the status of customer and employee relationships, his future business plans, and intentionally concealed that, while acting as a fiduciary of Ajuba International and President of Ajuba India, he took affirmative steps to misappropriate trade secrets, entice away customers and employees, and set up the AGS entities to directly compete against Plaintiffs.  The Court therefore finds that Plaintiffs have stated viable fraud claims against Saharia.

### vi.   Unjust Enrichment Claims

The parties dispute whether Plaintiffs can bring an unjust enrichment claim given that express contracts govern certain aspects of the parties' relationships.  Under Michigan law, the elements of an unjust enrichment claim are "(1) the receipt of a

benefit by defendant from plaintiff, and (2) an inequity resulting to plaintiff because of the retention of the benefit by the defendant." Sweet Air Inv., Inc. v. Kenney, 739 N.W.2d 656, 663 (Mich Ct. App. 2007). "There is no claim for unjust enrichment when there exists a valid contract covering the same subject matter." Iverson Industries, Inc. v. Metal Mgmt. Ohio, Inc., 525 F.Supp.2d 911, 922 (E.D. Mich. 2007) (citation omitted). Defendants argue that because Plaintiffs have asserted breach of contract claims based on agreements covering the same subject matter as the unjust enrichment claim, they cannot plead an unjust enrichment claim in the alternative.

At this point in the proceedings, the Court rejects Defendants' conclusion because it is unclear which contract allegedly covers the same subject matter as the unjust enrichment claims asserted against each of the three Defendants.  Under these circumstances, neither the operative pleading rules nor case law precludes alternative pleading.  See Detroit Tigers, 203 F.Supp.2d at 793; see also Hennigan v. General Elec. Co., No. 09-11912, 2010 WL 3905770, *15 (E.D. Mich. September 29, 2010) ("[U]nder Fed.R.Civ.P. 8(e)(2), a party may plead a contract claim and an alternative claim for unjust enrichment.").  Alternative pleading is particular appropriate here because Defendants dispute that any enforceable contract exists between Ajuba International and Saharia and none of the parties suggests that Plaintiffs had any contractual relationship the AGS entities.  See Date v. Sony Electronics, Inc., No. 07-15474,  2010 WL 3702599, *12 (E.D. Mich. September 16, 2010) (plaintiffs can plead their claim for unjust enrichment as an alternative to their claims for breach of contract so long as questions of fact exist as to the existence of a claim based on contract).

Accordingly, the Court declines to dismiss Plaintiffs' unjust enrichment claim at the pleading stage.

### vi.   Civil Conspiracy Claim

Plaintiffs bring a civil conspiracy claim against Defendants. "A civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means." Admiral Ins. Co. v. Columbia Cas. Ins. Co., 486 N.W.2d 351, 358 (Mich. Ct. App. 1992). A claim for civil conspiracy must be based on an underlying actionable tort. Advocacy Org. for Patients & Providers v. Auto Club Ass'n, 670 N.W.2d 569, 580 (Mich. Ct. App. 2003). Here, Plaintiffs carry their burden of stating a plausible conspiracy claim because they have successfully alleged several underlying tort claims against Defendants, including fraud, tortious interference, and misappropriation of trade secrets.

### c.   Diversity Jurisdiction Revisited

For the reasons stated above, the Court has concluded that citizens of Michigan, along with a citizen of India, have stated numerous claims against Defendants. Therefore, the Court finds it has subject matter jurisdiction under 28 U.S.C. 1332(a)(3) because this case is between citizens of different states, with foreign citizens as additional parties.

### 3.   Forum Non Conveniens

Defendants next argue that even if the Court has jurisdiction over this dispute, and Plaintiffs state valid claims, the case should nevertheless be dismissed under the doctrine of forum non conveniens so that the parties can litigate this dispute in the related action in India. A defendant invoking forum non conveniens bears a heavy

burden in opposing the plaintiff's chosen forum, especially when the forum is also the plaintiff's home state.  Sinochem Intern. Co. Ltd. v. Malaysia Intern. Shipping Corp., 549 U.S. 422, 430 (2007).  "A dismissal on forum non conveniens grounds is appropriate when the defendant establishes, first, that the claim can be heard in an available and adequate alternative forum and, second, that the balance of private and public factors listed in [Gulf Oil, 330 U.S. at 508–09)], reveals that trial in the chosen forum would be unnecessarily burdensome for the defendant or the court."  Duha v. Agrium Inc., 448 F.3d 867, 873 (6th Cir. 2006) (citation omitted).

The Court must first determine whether there is an adequate alternative forum. Wong v. PartyGaming Ltd., 589 F.3d 821, 830 (6th Cir.2009) (citation omitted). Generally, this requirement is satisfied if the defendant is "amenable to process" in the alternative forum.  Id.  "[W]here the remedy offered by the other forum is clearly unsatisfactory, the other forum may not be an adequate alternative, and the initial requirement may not be satisfied.  Thus, for example dismissal would not be appropriate where the alternative forum does not permit litigation of the subject matter of the dispute."  Piper Aircraft, 454 U.S. at 255 n.22.

Defendants fail to establish the existence of an adequate alternative forum.  In an attempt to carry their burden on this element, they simply assert: "there is no question that the Indian court is an adequate alternative forum. Plaintiff Ajuba India has brought suit there on this very same dispute."  (Doc. 16 at p. 29).  Defendants do not support this conclusory statement with any discuss or analysis as to how AGS US or AGS Health would be "amenable to process" in that jurisdiction.  Nor do they explain how Ajuba International or MiraMed could sue AGS US or AGS Health in India for their

numerous claims that arise under Michigan law.  Defendants' two-sentence declaration fails to persuade the Court that India is an adequate alternative forum.  Accordingly, the Court will not dismiss this matter under the doctrine of forum non conveniens.

### B.    Defendants' Motion to Stay

In the event the Court has jurisdiction, finds that Plaintiffs state valid claims, and declines to dismiss on forum non conveniens grounds, Defendants request a stay of this action under the <u>Colorado River</u> abstention doctrine in light of the related action in India. The Court applies a two-part test to determine whether these circumstances warrant abstention.  "First, it must decide whether or not the two proceedings are 'parallel.' If so, the analysis proceeds to a multi-factor balancing test laid out in <u>Colorado River Water</u> and subsequent Supreme Court decisions."  <u>CLT Logistics v. River West Brands</u>,  777 F.Supp.2d 1052, 1057 (E.D. Mich. 2011) (citations omitted); <u>see also</u> <u>Answers in Genesis of Kentucky, Inc. v. Creation Ministries Int'l, Ltd.</u>, 556 F.3d 459, 467 (6th Cir. 2009) (applying the <u>Colorado River</u> abstention analysis in the federal-foreign context); <u>accord</u> <u>Szabo v. CGU Intern. Ins., P.L.C.</u>,199 F.Supp.2d 715 (S.D. Ohio 2002).

The threshold question in the <u>Colorado River</u> abstention analysis is whether the proceedings are "parallel."  <u>Bates v. Van Buren Tp.</u>,  122 F.App'x 803, 806 (6th Cir. 2004); <u>Romine, 160 F.3d 337.  In </u>the Sixth Circuit, proceedings are "parallel" if they are "substantially similar." <u>Bates</u>, 122 F.App'x. at 806; <u>Romine</u>, 160 F.3d at 340. Substantial similarity generally exists where the parties are substantially similar and the claims are based on the same allegations as to the same material facts.  <u>Id.</u>; <u>see</u> <u>also</u> <u>Baskin v. Bath Tp. Bd. Of Zoning Appeals</u>, 15 F.3d 569, 572 (6th Cir.1994) (finding no parallelism based on the absence of parties and because the issues argued were not

substantially similar). Although identical parties are not required for parallelism, a similarity between the parties is relevant. Baskin, 15 F.3d at 572; Bates, 122 F.App'x. at 806. In sum, proceedings are "parallel" if there is a substantial similarity between the parties, facts, and claims.

Although undeniably related, the Indian lawsuit is not a "parallel proceeding" for purposes of Colorado River abstention. That suit contains two dispositive differences. First, the parties are not substantial similar. Ajuba India filed that suit against AGS India, Saharia and nineteen individual Indian citizens who resigned from Ajuba India to join AGS India. Ajuba India did not name AGS U.S. or AGS Health as defendants, nor are Ajuba International and MiraMed joined as plaintiffs. In this case, none of the nineteen former Ajuba India employees are named as defendants. As a result, the Indian lawsuit does not involve any U.S. citizens whereas this case involves a mixture of both U.S. and foreign citizens.

Second, the claims between the two proceedings are not substantial similar. The Indian suit is based solely on events which occurred in India and Ajuba India seeks damages only for harm caused in India. Ajuba India does not make any claims against AGS U.S. or AGS Health in the Indian suit. The Indian suit will therefore not address any wrongs committed outside of India, or by any Defendant in this matter other than Saharia and AGS India, Ajuba India specifically pled as much. (Doc. 23 Ex. A at ¶ 26). This lawsuit, on the other hand, is brought by Ajuba India, Ajuba International, and MiraMed, and seeks recovery for damages caused by Defendants' actions in India, Michigan, and elsewhere. The Indian court will not adjudicate any of Ajuba International's or MiraMed's claims for tortious interference with customer contracts to

36

which they—not Ajuba India—are a party, nor will it adjudicate Ajuba International's numerous other claims such as, misappropriation of trade secrets, breach of fiduciary duties, and breach of contractual confidentiality obligations.  Moreover, a victory by Ajuba India in the Indian suit will not reduce or extinguish the claims of Ajuba International or MiraMed.

The Supreme Court has made clear that a district court may enter an order staying the proceedings under the Colorado River abstention doctrine only if it has "full confidence" that the parallel proceeding will "'be an adequate vehicle for the complete and prompt resolution of the issues between the parties.'" Gulfstream Aerospace Corp. v. Mayacamas Corp., 485 U.S. 271, 277 (1988) (quoting Moses H. Cone Memorial Hospital v. Mercury Construction Corp., 460 U.S. 1, 28 (1983)).  "If there is any substantial doubt as to this, it would be a serious abuse of discretion to grant the stay or dismissal at all." Moses, 460 U.S. at 28.  Consequently, the circuit courts have held "'[i]f there is any substantial doubt that the parallel litigation will be an adequate vehicle for the complete and prompt resolution of the issues between the parties, it would be a serious abuse of discretion for the district court to stay or dismiss a case in deference to the parallel litigation.'" Chellman-Shelton v. Glenn, 197 F.App'x 392, 394 (6th Cir. 2006) (quoting TruServ Corp. v. Flegles, Inc., 419 F.3d 584, 592 (7th Cir. 2005); accord Woodford v. Cmty. Action Agency of Greene Cty., Inc., 239 F.3d 517, 523 (2d Cir. 2001).  Any doubt regarding the parallel nature of the related proceeding suit should be resolved in favor of exercising jurisdiction. Glenn, 197 F.App'x at 395 (citing TruServ, 419 F.3d at 592).  Here, given the substantial risk that the Indian suit will not provide complete and prompt relief on all of Plaintiffs' claims before this Court, the two actions

are not parallel and it would be a "serious abuse of discretion" to grant Defendants a stay on the grounds of abstention.  Accordingly, Defendants' motion is denied.

## IV.    CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is **GRANTED-IN-PART and DENIED-IN-PART** and their motion to stay is **DENIED.**

**IT IS SO ORDERED.**

s/Marianne O. Battani
MARIANNE O. BATTANI
UNITED STATES DISTRICT JUDGE


DATED:  May 14, 2012

CERTIFICATE OF SERVICE

I hereby certify that on the above date a copy of this Opinion and Order was served upon all parties of record via the Court's ECF Filing System.

s/Bernadette M. Thebolt
Case Manager