**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

AJUBA INTERNATIONAL, LLC, AJUBA
SOLUTIONS (INDIA) PRIVATE, LTD., and
MIRAMED GLOBAL SERVICES, INC.,

        Plaintiffs,

v.

DEVENDRA KUMAR SAHARIA, ADROIT
GLOBAL SOLUTIONS INDIA PRIVATE
LTD., ADROIT GLOBAL SOLUTIONS
INC., and AGS HEALTH, INC.,

        Defendants.

_____/

CASE NO. 2:11-cv-12936

HON. MARIANNE O. BATTANI

**OPINION AND ORDER GRANTING-IN-PART AND DENYING-IN-PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Before the Court is Defendants' Motion for Summary Judgment. Plaintiffs filed the instant action alleging Defendants misappropriated trade secrets and intentionally interfered with their contractual and business relationships in an effort to establish a competing company. The Court heard oral argument on the motion on June 16, 2014, and at the conclusion of the hearing, took the matter under advisement. For the reasons stated below, Defendants' motion is **GRANTED-IN-PART** and **DENIED-IN-PART**.

**I.    STATEMENT OF FACTS**

    **A.    Plaintiff Parties**

Plaintiff Ajuba International, L.L.C. ("Ajuba Int'l") is a Michigan limited liability company having its principal place of business in Jackson, Michigan. Plaintiff Ajuba Solutions (India) Private, Ltd. ("Ajuba India") is an Indian corporation having its principal place of business in Chennai, India. Plaintiff MiraMed Global Services, Inc. ("MiraMed")

is a Michigan corporation having its principal place of business in Jackson, Michigan. MiraMed wholly owns Ajuba Int'l. Ajuba Int'l wholly owns non-party Ajuba Solutions Mauritius Ltd., which in turn wholly owns Ajuba India. The above Plaintiff companies are collectively referred to as "Ajuba." Hamid Mirafzali, aka "Tony Mira," is the chairman and CEO of the Ajuba group of companies.

Ajuba is in the business of providing revenue cycle outsourcing to medical centers, hospitals, and healthcare systems. Companies in this industry enter data into third-party billing applications to generate and send bills to patients and insurance companies and also provide bill collection services. The industry is highly uniform, with many companies performing services for the same customers.

**B.     Defendant Parties**

Defendant Devendra Kumar Saharia, a former Michigan resident, is a citizen and current resident of India who co-founded Ajuba and served as its president from 2005 to 2011. Defendant Adroit Global Solutions India Private Ltd. ("AGS India") is a corporation organized under the laws of India, with its principal place of business in India. Defendant Adroit Global Solutions, Inc. ("AGS U.S.") is a Delaware corporation that has no operations, assets or place of business. Defendant AGS Health, Inc. ("AGS Health") is a Delaware corporation, with its principal place of business in New York. The above Defendant companies are owned by Saharia and are collectively referred to as "AGS."

**C.     Saharia's Relationship with Ajuba**

In 2000, Saharia co-founded Ajuba Int'l's predecessor company with Tony Mira. In July 2005, Saharia sold his ownership stake in that company to MiraMed. However,

MiraMed refused to purchase Saharia's stake unless he signed a non-compete agreement with Ajuba Int'l. On July 8, 2005, Saharia signed an Employment Agreement ("2005 Employment Agreement") with Ajuba Int'l and Ajuba India, which contained a noncompetition provision and named him as president of both companies. (Doc. 202, Ex. 25). He also signed a separate Noncompetition Agreement ("2005 Noncompetition Agreement") with Ajuba Int'l. (Doc. 222, Ex. 30). The Employment Agreement expired by its own terms on July 7, 2008. Shortly thereafter, Saharia signed a new Employment Agreement ("2008 Employment Agreement") with Ajuba India. (Doc. 202, Ex. 26). This agreement does not contain a non-compete provision.

On February 18, 2011, Maya Mohan, Ajuba's Director of Operations, resigned. On February 23, 2011, Shankar Narasimhan, Ajuba's Director of Finance and Human Resources, resigned. The next day, Saharia submitted his formal resignation to Ajuba, but continued working until March 31, 2011. Around the same time, Saharia and several other employees negotiated the purchase of their company laptops from Ajuba.

On April 6, 2011, Saharia purchased AGS and hired Mohan and Narasimhan. In May 2011, AGS began working with customers and eventually signed McKesson, one of Ajuba's former clients. AGS also hired several former Ajuba employees.

### D. Procedural History

On July 7, 2011, Plaintiffs filed a ten-count complaint against Defendants. A lawsuit was also filed in India. On October 17, 2011, Plaintiffs filed an amended complaint alleging: (1) breach of fiduciary duties; (2) aiding and abetting breach of fiduciary duties; (3) breach of noncompetition agreement; (4) breach of employment agreement; (5) tortious inference; (6) misappropriation of trade secrets; (7) violation of

federal Computer Fraud and Abuse Act ("CFAA"); (8) fraud; (9) silent fraud; (10) unjust enrichment; and (11) civil conspiracy. Defendants filed a motion to dismiss for lack of personal jurisdiction, lack of subject matter jurisdiction, failure to state a claim, and several other arguments. The Court granted-in-part and denied-in-part the motion, dismissing the federal CFAA count but retaining jurisdiction over the remaining claims under 28 U.S.C. § 1332(a)(3). Defendants now seek summary judgment on all counts, or alternatively, an order listing the facts not in dispute under Fed. R. Civ. P. 56(g).

## II.  ANALYSIS

Summary judgment is appropriate only when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). Rule 56 mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. Once the moving party meets this burden, the non-movant must come forward with specific facts supported by affidavits or other appropriate evidence establishing a genuine issue for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Fed. R. Civ. P. 56(c)(1)(A). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144,

157 (1970). The Court "must lend credence" to the non-moving party's interpretation of the disputed facts. Marvin v. City of Taylor, 509 F.3d 234, 238 (6th Cir. 2007) (citing Scott v. Harris, 127 S.Ct. 1769, 1775 (2007)). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. Hopson v.DaimlerChrysler Corp., 306 F.3d 427, 432 (6th Cir. 2002).

In addition, as the Court is exercising diversity jurisdiction over the subject matter of this action, Michigan law applies. Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938). Consequently, "the Court is obliged to apply the law in accordance with the decisions of the Michigan Supreme Court." Universal Image Prod., Inc. v. Chubb Corp., 703 F. Supp. 2d 705, 707 (E.D. Mich. 2010) (citing Meridian Mut. Ins. Co. v. Kellman, 197 F.3d 1178, 1181 (6th Cir. 1999)).

### A. Breach of Fiduciary Duty, Counts I & II

In the Amended Complaint, Plaintiffs allege that Saharia breached his fiduciary duties to Ajuba in three general ways: (1) allowing Ajuba's contract with McKesson to expire so he could move the business to AGS; (2) soliciting several of Ajuba's top management and employees to work for AGS during his term as president; and (3) damaging Ajuba's relationship with its longstanding customer, MedData. In addition, Plaintiffs assert that Defendants are liable for aiding and abetting Saharia's breach of fiduciary duties by assisting and participating in Saharia's plan to set up AGS at the expense of Ajuba. In contrast, Defendants assert that Saharia only took actions to prepare for competition and that any transfer of employees or customers to AGS occurred after Saharia left Ajuba.

Corporate directors and officers "have unique obligations to further the interests of the corporation generally and its owners specifically." Kreinberg v. Dow Chem. Co., 2007 WL 2782060, at *4 (E.D. Mich. Sept. 24, 2007). In Michigan, corporate directors and officers are fiduciaries "who owe a strict duty of good faith to the corporation which they serve." Prod. Finishing Corp. v. Shields, 405 N.W.2d 171, 174 (Mich. Ct. App. 1987). "Although the parameters of this duty are not well-defined, some general rules exist. For example, an employee may take steps to establish a competing business while still employed without breaching the duty of loyalty, but the employee may not actually commence competition." In re Sullivan, 305 B.R. 809, 819 (Bankr. W.D. Mich. 2004). In addition, corporate directors or officials may not divert a business opportunity for personal gain if the corporation is financially able to undertake such opportunity. Prod. Finishing, 405 N.W.2d at 174.

Plaintiffs allege that during the initial stages of Saharia's plan to start AGS, Ajuba's business with one of its customers, MedData, substantially declined. This allegation is supported by the declaration of Ann Barnes, Chief Executive Officer of MedData. In late 2010, Barnes noticed a decrease in the quality of Ajuba's services, specifically, a lack of responsiveness from Ajuba employees Jim Phillips and Maya Mohan. (Doc. 222, Ex. 47, ¶ 3). In February 2011, Barnes traveled to Ajuba India and met with Saharia and Mohan. (Id. at ¶ 5). During the visit, Barnes claims that Saharia blamed MedData for the decrease in productivity and was otherwise unapologetic. (Id.) Saharia also notified Barnes that Mohan was leaving Ajuba, but declined tell Barnes the reasons for such. (Id. at ¶ 6). Instead, Saharia told Barnes that she "would have to make [her] own decision about whether MedData should continue using Ajuba as a

6

service provider." (Id.) Saharia then suggested Barnes meet with Mohan a few days later.

At the later meeting, Mohan informed Barnes that Mohan and Phillips were leaving Ajuba to join a new company. (Id. at ¶ 7). Mohan then asked if MedData would be willing to transfer its business to the new company. (Id.) In addition, Mohan declined to address whether Saharia was leaving Ajuba as well. (Id.) Consequently, Barnes decided to transition business away from Ajuba as the result of the "unprofessional" nature of the meetings.

It is undisputed that, as president, Saharia was required to act in the best interests of Ajuba. Although Defendants are correct that "preparing to compete is qualitatively different than actually competing with one's present employer and will not, by itself, support a breach of loyalty claim," Fitness Experience, Inc. v. TFC Fitness Equipment, Inc., 355 F. Supp. 2d 877, 893 (N.D. Ohio 2004) (internal quotations omitted), a reasonable jury could find that Saharia breached his fiduciary duty to Ajuba by soliciting MedData to terminate its relationship with Ajuba and seek another service provider. Defendants claim that no damage occurred to Ajuba; however, the declaration creates a question of fact regarding whether Saharia solicited corporate business for personal gain. Therefore, summary judgment is inappropriate on Count I.

In addition, Plaintiffs assert AGS is liable for aiding and abetting Saharia's breach of fiduciary duties. This requires Plaintiffs to demonstrate: "(1) a breach of fiduciary duty by a person; (2) knowledge by the defendant of the other person's breach of fiduciary duty; (3) substantial assistance or encouragement by the defendant to the person breaching the fiduciary duty; and (4) resulting harm." In re NM Holdings Co. LLC v.

Deloitte& Touche, LLP, 405 B.R. 830, 846 (Bankr. E.D. Mich. 2008). Given Saharia and Mohan's alleged concerted efforts in attempting to sway MedData to work with AGS, a reasonable jury could find in favor of Plaintiffs on Count II.

### B.     Breach of Contract, Counts III & IV

Next, Plaintiffs assert breach of contract against Saharia under the non-disparagement and confidentiality provisions of the 2005 Noncompetition Agreement and the 2008 Employment Agreement.  At oral argument, Plaintiffs abandoned their claim for breach of the non-disparagement provisions of the agreements.  Specifically, Plaintiffs claim that Defendants purchased their laptops from Ajuba knowing they contained confidential information and trade secrets, which furthered AGS's ability to become "production ready" so quickly.

Under Michigan law, the elements of a breach of contract claim are (1) the existence of a valid contract, (2) the terms of the contract, (3) that defendant breached the contract, and (4) that the breach caused the plaintiff injury.  In re Brown, 342 F.3d 620, 628 (6th Cir. 2003).

The parties do not dispute that both agreements contain confidentiality provisions that prohibit use or disclose of such information without the consent of Ajuba.  (Doc. 222, Ex. 30, p. 3; Ex. 31, p. 5).   In support of breach, Plaintiffs provided evidence that the laptop of Stephanie Gregory, an Ajuba employee that moved to AGS, contained files with confidential information that were accessed after Gregory left Ajuba.  The expert report submitted by Plaintiffs indicates that several files containing Ajuba information were accessed after April 1, 2011, Gregory's last day at Ajuba. (Doc. 222, Ex. 19, p. 19-20).

In her deposition, Gregory stated that she accessed her laptop once after she left Ajuba to retrieve her personal files. (Doc. 222, Ex. 20, p. 117). She stated that she did not purchase the laptop, and that someone was supposed to come pick it up. (Id. at p. 115). Gregory asserts that she did not access any confidential files because she "had no need for them." (Id. at p. 213). It is unknown when Gregory last accessed the laptop after her resignation from Ajuba and the record is devoid of testimony regarding who had possession of the laptop thereafter.

Assuming that both the 2005 Noncompetition Agreement and the 2008 Employment Agreement are valid only for purposes of this motion, a reasonable jury could not find that Saharia breached the confidentiality provisions in either agreement. Essentially, Plaintiffs suggest that Saharia committed a breach because Gregory accessed her laptop a few days after she left Ajuba. But, Gregory is not a party to this action and there is no evidence that Saharia conspired with or directed Gregory to access and disclose confidential information on her laptop for the benefit of AGS. In fact, Gregory testified that she did not even want to purchase the laptop and that she had no reason to access any of the confidential files post-employment.

In addition, there is no evidence that Saharia personally accessed information on any laptops for use in forming AGS. Ajuba's failure to wipe its company laptops before selling them to future AGS employees is insufficient to establish a breach of the confidentiality agreements between Ajuba and Saharia. Thus, the Court declines to impute a breach by Saharia through the conduct of Gregory, a third-party, based purely on a scintilla of circumstantial evidence. Summary judgment will be granted in favor of Saharia on Counts III and IV.

### C. Tortious Interference, Count V

Next, Plaintiffs claim that Defendants sabotaged Ajuba's business relationships with MedData and McKesson. Plaintiffs also claim Defendants interfered with the protectable business relationships of their employees. Defendants assert that these claims fail because no contracts were breached and normal competition is privileged. Defendants' arguments are unpersuasive.

Under Michigan law, "tortious interference with a contract or contractual relations is a cause of action distinct from tortious interference with a business relationship or expectancy." Health Call of Detroit v. Atrium Home & Health Care Servs., Inc., 706 N.W.2d 843, 848 (Mich. Ct. App. 2005) (citations omitted). The elements of the former are "(1) the existence of a contract, (2) a breach of the contract, and (3) an unjustified instigation of the breach by the defendant." Id. at 849. Whereas elements of the later include (1) the existence of a valid business relationship or expectancy that is not necessarily based on an enforceable contract; (2) knowledge of the relationship or expectancy on the part of the defendant; (3) an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy; and (4) resulting damage to the party whose relationship or expectancy was disrupted. Id.

Plaintiffs' claims are more properly construed as tortious interference with a business relationship or expectancy, as it is undisputed that no contracts were breached with any customers and the employees served in "at-will" capacities without the benefit of employment contracts. Defendants do not dispute that Ajuba had valid business relationships with its customers. They do, however, argue that Ajuba did not have valid business relationships with its employees. But, Defendants' assertion that "there can be

10

no claim of tortious interference with a contract with respect to at-will employees" is misplaced. Michigan courts clearly recognize that such a claim is actionable. See Health Call of Detroit v. Atrium Home & Health Care Servs., Inc., 706 N.W.2d 843, 850 (Mich. Ct. App. 2005) (recognizing existence of claim); Feaheny v. Caldwell, 437 N.W.2d 358, 364 (Mich. Ct. App. 1989) (same) (overruled in part on other grounds); Burger v. Ford Motor Co., 2014 WL 132444 *3 (E.D. Mich. Jan. 14, 2014) ("We agree with plaintiff's argument that tortious interference with an at-will employment contract is actionable."). Thus, the only issue in dispute is whether Defendants intentionally interfered with Ajuba's business relationships.

As previously stated, the declaration of Ann Barnes creates at least one genuine dispute of fact regarding whether Saharia and Mohan wrongfully solicited business on behalf of AGS. The same evidence provides a basis upon which a reasonable jury could determine that Defendants intentionally interfered with Ajuba's business relationship with MedData. Therefore, summary judgment is inappropriate on Count V.

### D. Misappropriation of Trade Secrets, Count VI

Count VI of Plaintiffs' complaint asserts a claim of misappropriation of trade secrets against all Defendants. The Michigan Uniform Trade Secrets Act ("MUTSA") defines "trade secret" accordingly:

> (d) "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that is both of the following:
>
> (i) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

> (ii) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Mich. Comp. Laws § 445.1902.  In determining whether information constitutes a trade secret, courts look to several factors:

> (1) extent to which information is known outside of owner's business, (2) extent to which information is known by employees and others involved in business, (3) extent of measures taken to guard secrecy of information, (4) value of information to owners and competitors, (5) amount of effort and money expended in developing information, and (6) ease or difficulty with which information could be properly acquired or duplicated by other.

Dura Global Techs., Inc. v. Magna Donnelly Corp., 662 F. Supp. 2d 855, 859 (E.D. Mich. 2009) (quoting Wysong Corp. v M. I. Indus., 412 F. Supp. 2d 612, 626 (E.D. Mich. 2005)).

A person is liable under the Act if they misappropriate a trade secret.  This means

> (i) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means.
>
> (ii) Disclosure or use of a trade secret of another without express or implied consent by a person who did 1 or more of the following:
>
> (A) Used improper means to acquire knowledge of the trade secret.
>
> (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was derived from or through a person who had utilized improper means to acquire it, acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived it from or through a person who owed a duty to the person to maintain its secrecy or limit its use.
>
> (C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Mich. Comp. Laws § 445.1902.

Plaintiffs claim Defendants misappropriated (1) proprietary training programs; (2) confidential information regarding Ajuba's revenue cycle management services; (3) proprietary software and automation tools; (4) confidential personnel information; and (5) client relationship information. Plaintiffs argue that it developed most of this information and that it is not generally known to the public. In addition, Plaintiffs assert that the information has independent economic value and that it took reasonable steps to protect the information.

In contrast, Defendants argue that Plaintiffs failed to establish the existence of any trade secrets, instead relying on generic terms and overly broad references. In addition, Defendants assert that there is no evidence of misappropriation. After review, the Court agrees and finds that Plaintiffs (1) failed to meet their burden to specifically identify at least one trade secret upon which they could recover for misappropriation, and (2) failed to produce any evidence of misappropriation. See Dura Global, 662 F. Supp. 2d at 859 (noting that the plaintiff in a trade secret case bears the burden of proving the specific nature of the trade secrets).

Generally, "trade secret law does not protect 'an idea which is well known or easily ascertainable.'" Dice Corp. v. Bold Tech., 556 F. App'x 378, 385 (6th Cir. 2014) (quoting Manos v. Melton, 100 N.W.2d 235, 238 (Mich. 1960)). In addition, "the secret information must afford the owner a competitive advantage by having value to the owner and potential competitors." Daimler-Chrysler Servs. North Am., LLC v. Summit Nat., Inc., 289 F. App'x 916, 922 (6th Cir. 2008). Importantly, the plaintiff must identify the trade secrets with specificity. Dura Global, 662 F. Supp. 2d at 859.

Defendants submitted a declaration from P.K. Prasad, Company Secretary and Associate Director of Legal and Corporate Affairs for AGS, who described the revenue cycle outsourcing industry as highly standardized with uniform pricing, uniform contract terms, and uniform claims and coding processes. (Doc. 202, Ex. 1) Prasad asserts that no "unique trade secrets [are] required to run an offshore RCM company." (Id.) Much of the work is done on the client's billing systems in accordance with the client's instructions using standardized medical coding. (Doc. 202, Ex. 4, p. 222-24). Client lists are openly available given the high turnover rate of employees and gaining access to new clients is achievable through using professional networking sites. (Doc. 202, Ex. 1, p. 4). In addition, clients often have multiple vendors handle similar work for hedging reasons. (Id. at p. 5).

With respect to employee training and human resource information, much of this information can be found in online portals. (Id. at p. 7). In addition, the high employee turnover rate adds to the free flow of information between companies, as employees may work for several different companies throughout their careers. When clients move work from one company to another, employees sometimes move with the client. (Id. at p. 8). Training systems can be purchased online and most programs teach new employees about the revenue cycle outsourcing industry with information that is available to the general public. (Id. at p. 10).

Defendants also rely on Dice Corp. v. Bold Technologies to support their position. In Dice, the plaintiff filed suit under MUTSA for misappropriation of two trade secrets relating to alarm system computer coding. 556 F. App'x at 385. The plaintiff claimed that the defendant wrongfully entered its computer servers to extract

14

information relating to a client that was transitioning from the plaintiff's alarm system to the defendant's alarm system. Id. at 380. The plaintiffs provided no evidence of independent economic value or why the alleged trade secrets qualified as such. In its rejection of the plaintiff's trade secret claims, the court noted that "[o]ther than a generalized explanation of what the [items] do," the plaintiff provided no evidence that the items met the criteria of MUTSA. Id. at 385-87.

Like Dice, Plaintiffs in this case failed to specifically identify any trade secrets and explain how such items are protectable under MUTSA. Plaintiffs' brief refers to generic descriptions such as "procedures" and "training programs" without explaining why the information provides them a competitive advantage in the revenue cycle outsourcing industry. Items such as "personnel and client information" and "instruction manuals" are identified as trade secrets. Information such as customer lists are not trade secrets where the information is readily ascertainable from other channels, as is the case here. See Raymond James & Assoc., Inc. v. Leonard & Co., 411 F. Supp. 2d 689, 694 (E.D. Mich. 2006) (rejecting customer list as trade secret where information was available in online postings and the defendant's memory). In addition, Plaintiffs provided no evidence regarding Ajuba's efforts in developing any of the alleged trade secrets or how they derive independent economic value.

Similar to Dice, although "software and automation tools" are alleged as trade secrets, Plaintiffs provide no explanation as to what functions the software performs and how it operates in a way unique to competing companies. Instead, Ajuba provides blanket statements that its "trade secrets are extremely valuable in that a competitor with access to them could gain an unfair advantage . . . ." But, Plaintiffs failed to explain

and provide any evidence as to how its trade secrets are different from similar programs or information used in the industry, thereby providing Ajuba with a competitive advantage. How these alleged trade secrets may provide an unfair advantage to a competing company is absent from Plaintiffs' brief, which led the court in <u>Dice</u> to affirm the district court's grant of summary judgment to the defendant.

In an attempt to save their MUTSA claim, Plaintiffs assert that their discovery responses to Defendants' interrogatories adequately describe the alleged trade secrets. (Doc. 222, Ex. 69, p. 5; Ex. 70, p. 5-11). However, he same general descriptions and conclusory allegations that are found in Plaintiffs' brief are also found in the responses and provide little help to the Court. Moreover, it is Plaintiffs' burden to present specific evidence of trade secrets supported by exhibits in the record. Referencing several pages of discovery responses without any supporting explanation or independent evidence is insufficient. <u>See</u> <u>Mitchell v. City of Moore</u>, 218 F.3d 1190, 1199 (10th Cir. 2000) (noting that it is not the district court's job to "comb the record in order to make [the non-movant's] arguments for him").

Consequently, Plaintiffs failed to demonstrate that any of the alleged trade secrets qualify as such under MUTSA. In addition, there is no evidence that Defendants misappropriated any trade secrets. Plaintiffs provided no direct evidence, instead relying on an argument that AGS must have used trade secrets to become "production ready" so quickly. This circumstantial evidence, alone, is insufficient, especially where Plaintiffs provided no evidence of the average amount of preproduction time and resources necessary to start a revenue cycle outsourcing

company. Therefore, no genuine dispute of fact exists and summary judgment will be granted in favor of Defendants on Count VI.

### E. Fraud, Counts VIII & IX

In Counts VIII and IX, Plaintiffs allege that Saharia committed fraud by allegedly telling Mira that he was not going to compete with Ajuba upon his departure. Plaintiffs also assert that Saharia had a duty to disclose the expiration of the McKesson contract, concerns with the McKesson relationship, the corporate opportunity for the Per Se segment of McKesson, MedData's concerns with Ajuba's performance, Mohan's solicitation of MedData, and that he was moving several employees with him to AGS.

In order to demonstrate intentional misrepresentation, a plaintiff must show:

> (1) That defendant made a material misrepresentation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth, and as a positive assertion; (4) that he made it with the intention that it should be acted upon by Plaintiffs; (5) that Plaintiffs acted in reliance upon it; and (6) that he thereby suffered injury.

Hi-Way Motor Co. v. Int'l Harvester Co., 247 N.W.2d 813, 816 (Mich. 1976) (internal quotations omitted). Silent fraud requires "a legal or equitable duty of disclosure." Hord v. Env'l Research Inst. of Mich., 617 N.W.2d 543, 550 (Mich. 2000).

As President of Ajuba, Saharia had a duty to disclose information harmful to the company. However, an officer need not disclose "possible future competition." Petroleum Enhancer, LLC v. Woodward, 2014 WL 903430, at *8 (6th Cir. March 7, 2014). Insofar as Plaintiffs rely on Saharia's statement that he was not going to compete with Ajuba, there is no evidence to support that Saharia made any such statement. Rather, Mira testified that he told Saharia: "I hope you're not going to compete with Ajuba" which Saharia "laughed [ ] off" and mentioned that he wanted to

17

spend more time with his family. (Doc. 222, Ex. 2, p. 198). This cannot serve as the basis for an intentional misrepresentation claim.

Nonetheless, there is a genuine dispute of fact regarding whether Saharia failed to disclose Mohan's solicitation of MedData while Saharia was still the acting president of Ajuba. Although this may not rise to the level of fraud, Saharia had a duty to not divert business from Ajuba or undermine preexisting relationships with customers. This claim requires similar facts as Plaintiffs' breach of fiduciary duty claim and will be resolved by a jury. Thus, summary judgment is inappropriate on Counts VIII and IX.

### F. Unjust Enrichment, Count X

The elements of unjust enrichment are "(1) receipt of a benefit by the defendant from the plaintiff and, (2) which benefit it is inequitable that the defendant retain." Dumas v. Auto Club Ins. Ass'n, 473 N.W.2d 652, 663 (Mich. 1991) (internal quotations omitted). Generally, where a contract governs the relationship between the parties, a plaintiff cannot recover under a quasi-contractual theory. See King v. Ford Motor Credit Co., 668 N.W.2d 357, 371 (2003) ("[A] contract will not be implied under the doctrine of unjust enrichment where a written agreement governs the parties' transaction.").

The parties do not dispute that one of the contracts governs any breach of confidentiality. Because unjust enrichment is inapplicable where contract law governs, any alleged unjust enrichment on this theory is improper. Moreover, in their brief, Plaintiffs claim that Defendants have been unjustly enriched by Plaintiffs in "several ways" without citing a single instance independent of any contractual duty. Plaintiffs failed to fully develop their argument in their brief, and this is fatal to their claim. Therefore, Defendants are entitled to summary judgment on Count X.

### G. Civil Conspiracy, Count XI

"A civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means." Admiral Ins. Co. v. Columbia Cas. Ins. Co., 486 N.W.2d 351, 358 (Mich. Ct. App. 1992). A claim for civil conspiracy must be based on an underlying actionable tort. Advocacy Org. for Patients & Providers v. Auto Club Ass'n, 670 N.W.2d 569, 580 (Mich. Ct. App. 2003).

As stated above, there is at least one genuine dispute of fact regarding Plaintiffs' claims of breach of fiduciary duties, tortious interference with business relationships, and fraud. In addition, a conspiracy between Saharia, Mohan, and Narasimhan to divert business and employees away from Ajuba could be supported by the transcript of the online chat session between Saharia and Narasimhan in which they discuss receiving information from Ajuba employees and modifying start dates for former Ajuba employees. See (Doc. 222, Ex. 52). Thus, the existence of such a conspiracy is a question of fact for the jury, and therefore Plaintiffs' civil conspiracy count survives.

### H. Fed. R. Civ. P. 56(g)

Last, Defendants request the Court issue an order listing undisputed material facts. Fed. R. Civ. P. 56(g) provides that if a district court does not grant "all the relief requested" by a motion for summary judgment, the court may enter an order setting forth any material fact not in dispute. Whether such an order is appropriate is subject to the court's discretion. "The court may conclude that it is better to leave open for trial facts and issues that may be better illuminated by the trial . . . ." Fed. R. Civ. P. 56 advisory committee's notes (2010).

The Court declines to issue an order under Rule 56(g). The facts underlying Plaintiffs' claims are substantially interrelated and a vast majority are disputed. Thus, it is more appropriate for a jury make the factual determinations in this matter.

## IV. CONCLUSION

Accordingly, Defendants' motion is **GRANTED** with respect to Counts III, IV, VI, and X; and **DENIED** with respect to all remaining Counts.

**IT IS SO ORDERED.**

Date: July 14, 2014
                                                     s/Marianne O. Battani
                                                     MARIANNE O. BATTANI
                                                     United States District Judge

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on July 14, 2014.

                                                     s/ Kay Doaks
                                                     Case Manager